# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

SCANNED at PENDLETON and Emailed on
5/28/19 by KC - 147 pages.
(date)   (initials)   (num)

Virgil Griffin,  )
    Plaintiff,  )
      )
v.  )  Case No. 1:19-cv-00882-JPH-MPB
      )
R. Carter, et al,  )
    Defendants.  )

**FILED**
1:09 pm, May 31, 2019
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Laura A. Briggs, Clerk

## I. AMENDED COMPLAINT

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation of rights secured by the Constitution of the United States, under color of State law. The court has jurisdiction under 28 U.S.C. 1331 and 1343 (a)(3). Plaintiff Virgil Griffin seeks declaratory relief pursuant to 28 U.S.C. 2201 and 2202. Plaintiff Virgil Griffin's claims seek injunctive relief are authorized by 28 U.S.C. 2283 and Rule 65 of the F.R.C.P.

2. The Southern District of Indiana is an appropriate venue under 28 U.S.C 1391 (b)(2) because it is where the events giving rise to these claims occured

## II. Plaintiff

3. Plaintiff Virgil Griffin, is and was at all times mentioned herein a prisoner of the Pendleton Correctional Facility in the custody

1

of the Indiana Department of Corrections, and is currently confined in Pendleton, Indiana. At all times assigned to the Department Wide Administrative Restrictive Housing Unit.

- ADMINISTRATION DEFENDANTS - III.

4. Defendant, Robert Carter, is the Commissioner of the State of Indiana Department of Corrections. He is legally responsible for the overall operations of the Department and each institution under its jurisdiction including the Pendleton Correctional Facility.

5. Defendant, Michael OSburn, is the Regional Director of the Indiana Department of Corrections. He is responsible for coordinating within the Department and between facilities and operations in the Southern Region of Indiana, including mental health and transfer related issues concerning the Pendleton Correctional Facility.

6. Defendant, Dushan Zatecky, is the Warden of Pendleton Correctional Facility. He is legally responsible for the operation of the Pendleton Correctional Facility, and for the welfare of all inmates in that facility.

7. Defendant, Dennis Reagle, is the Deputy Warden of Pendleton Correctional Facility. He is responsible for facilitating the operations within the Pendleton Correctional Facility and the Department Wide Administrative Restrictive Housing Unit.

8. Defendant, Duane Alsip, is the Deputy Warden of Pendleton

2

Correctional Facility. He is responsible for facilitating the operations within the Pendleton Correctional Facility and the Department Wide Administrative Restrictive Housing Unit.

9. Defendant, John Safford, is the Unit Team Manager at the Pendleton Correctional Facility. He is the administrative Superviser of the Department Wide Administrative Restrictive Housing Unit's Clinician/Unit Team of Case Work Managers and Counselors.

10. Defendant, Chad Evans, is a Case Work Manager at the Pendleton Correctional Facility. He is responsible for oversight and/or administration of the rehabilitation plans, clerical duties and classification related matters concerning those inmates under his designation of responsibility and was assigned to G-cell house, Department Wide Administrative Restrictive Housing Unit.

— CUSTODY DEFENDANTS —

11. Defendant, Mike Conyers, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Major and was assigned to the Pendleton Correctional Facility.

12. Defendant, Jeremy Ruttan, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Captain and was assigned to the Pendleton

3

Correctional Facility.

13. Defendant, Jerry Gilley, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Captain and was assigned to the Pendleton Correctional Facility.

14. Defendant, Jim Boldman, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Captain and was assigned to the Pendleton Correctional Facility.

15. Defendant, Charles Rinehart, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Captain and was assigned to the Pendleton Correctional Facility.

16. Defendant, Joshua Shaver, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Lieutenant and was assigned to the Pendleton Correctional Facility.

17. Defendant, Joseph McCutcheon, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Lieutenant and was assigned to the Pendleton

Correctional Facility.

18. Defendant, Steven Hill, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Lieutenant and was assigned to Pendleton Correctional Facility.

19. Defendant, Kathleen Simone, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Lieutenant and was assigned to Pendleton Correctional Facility.

20. Defendant, Jason Ernest, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Lieutenant and was assigned to Pendleton Correctional Facility.

21. Defendant, Jerry Holmes, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Sergeant and was assigned to Pendleton Correctional Facility.

22. Defendant, Sergeant Sarfen, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Sergeant and was assigned to the Pendleton

Correctional Facility

23. Defendant, Officer Fish, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Officer and was assigned to Pendleton Correctional Facility.

24. Defendant, Officer Hargus, is a Correctional Officer of the Indiana Department of Corrections who, at all times mentioned held the rank of Officer and was assigned to pendleton Correctional Facility.

— UNNAMED DEFENDANTS —

25. Defendant, "John Doe", is the Executive Director of Classification of the Indiana Department of Corrections. This person is responsible for the approval of transfers and placement related issues for prisoners in facilities throughout the Indiana Department of Corrections.

26. Defendant, "John Doe", is the Deputy Commissioner of Operations of the Indiana Department of Corrections. This person is responsible for the facilitation of transfers and the assignment of prisoners to facilities throughout the Indiana Department of Corrections.

6

- MENTAL HEALTH DEFENDANTS -

27. Defendant, Roger Perry, was the supervising Doctor / Lead Psychologist of the Mental Health Department at the Pendleton Correctional Facility. He was responsible for the operations of Mental Health Services, which, Contractor, "Wexford Health" was in control of.

28. Defendant, Ciemone Easter-Rose, is the Supervising Doctor / Lead Psychologist of the Mental Health Department at the Pendleton Correctional Facility. SHe is responsible for the operations of Mental Health Services, which, Contractor, "Wexford Health" is in control of.

29. Defendant, Martin Perdue, is a Mental Health Specialist. He is the immediate Mental health services Care taker for those assigned to Restrictive Status Housing Units at Pendleton; Which, Contractor, "Wexford Health" is in control of.

— MEDICAL HEALTH CARE DEFENDANTS —

30. Defendant, Paul Talbot, is the Facility's Designated Physician. He is responsible for making medical judgements and monitoring

the delivery of Health Services provided by nursing at the Pendleton Correctional Facility; which, Contractor, "Wexford Health," is in Control of.

31 Defendant, Carrie Stephens, is the Director of Nursing of the Health Care Services at the Pendleton Correctional Facility; which, Contractor, "Wexford Health" is in Control of.

32. Defendant, Brittany Moore-Groves, is a Nurse at the Pendleton Correctional Facility.

33. Defendant, Nurse M. Walker, is a Nurse at the Pendleton Correctional facility.

— CORPORATE BUSINESS DEFENDANT —

34. Defendant, Wexford Health, is the Private Contractor which is responsible for providing Mental Health and Medical Health Care Services to people confined to the custody of the Indiana Department of Corrections; including Pendleton Correctional Facility.

35. Each defendant is being sued individually and in his or her official capacity. At all times mentioned in this complaint each defendant acted under color of state law.

## IV.   — FACTS SUPPORTING FAILURE TO PROTECT —

36. 2C, 4C, 6C are all ranges/tiers in G-Cell house at the Pendleton Correctional Facility which collectively Constitute Department-Wide Administrative Restrictive Status Housing Unit (DWARSHU); Where, according to D.O.C. policy, those Considered the most Serious threats within Indiana D.O.C. are housed. (See Attached I.D.O.C. Administrative Restrictive Status Housing Policy 02-01-111 Sections III (B) and (F); and IV (B); and V (B)(1)(a)-(g)

37. At the time of most of the allegations and injuries described in this Complaint the plaintiff, Ryan Estick, Witnesses-Declarants, as well as several other prisoners, who had previous mental illness Commitments, like Estick; were all housed on DWARSHU.

38. Lieutenant J. Ernest was the G-Cell house Custody Supervisor and had been told by Estick, prior to Febuary 11, 2019, that if he was not transferred to a unit which would provide him with the appropriate mental health treatment, he would assault and continue to escalate his assaults from throwing feces and urine to stabbing people

39. Mental Health Specialist M. Perdue was the G-cell house immediate mental health Counselor and had been told by Estick, prior to Febuary 11, 2019, that if he was not transferred to a unit which would provide

him with the appropriate mental health treatment, he would assault and Continue to escalate his assaults from throwing feces and urine to stabbing people.

40. Dr. Easter-Rose was the Lead Psychologist at the Pendleton Correctional Facility and had been told by Eslick, prior to February 11, 2019, that if he was not transferred to a unit which would provide him with the appropriate mental health treatment, he would assault and Continue to escalate his assaults from throwing feces and urine to stabbing people.

41. Eslick, prior to February 11, 2019, had an extensive history of disruptive and aggressive outburst including the repeated act of defiling the ranges/tier with feces and urine and violent behavior, including an assault on another prisoner, Joshua Harter, in the Shower area, during the operations of Showers; by spraying him with a bottle of feces and urine, as he walked pass Eslick's Shower at the end of 2018.

42. On February 11, 2019, I was Stabbed, by Eslick, with a spear as I was escorted pass Eslick's Shower by Sergeant Holmes who was G-cell house Supervising officer during a night Shift bracket.

43. Sergeant Holmes was aware that Eslick had previously assaulted Harter with feces and urine as a result of "Roll-Call" discussions between Staff, and that Eslick needed to be Watched and Showered Seperately. However, was not given any documentary instructions by his supervisors on the matter.

44. Case Work Manager Evans was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike, through incident reports which are circulated through the email System at the prison, as well as conduct reports, threats to mental health and custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

45. Unit Team Manager Safford was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike, through incident reports which are circulated through the email System at the prison, as well as conduct reports, threats to mental health and custody Staff, and Eslick's classification transfer papers and mental health reports, email or fax.

46. Deputy Warden Reagle was provided information to make

him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

47. <u>Deputy Warden Alsip</u> was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

48. <u>Warden Zatecky</u> was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as conduct reports, threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

12

49. Regional Director Mr. Osburn, was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through Indiana Department of Corrections email Systems, as well as threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

50. Commissioner Mr. R Carter was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through Indiana Department of Corrections email Systems, as well as threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

51. The Executive Director of Classification was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through Indiana Department of Corrections email Systems, as well as threats to mental health and Custody Staff, and

Eslick's classification transfer papers and mental health reports, emails or fax.

52. Deputy Commissioner of Operations was provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and Other inmates alike; through incident reports which are circulated through Indiana Department of Corrections email systems, as well as threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

53. On Febuary 11, 2019, Officer Fish did escort Eslick to the Shower, during the operations of Showers on 2C Range, with all other prisoners in G-house on 2C Range despite the fact that he was familiar with Eslick's history of being a threat and continued risk of assault to others; and did not secure him inside the Shower according to policy.

54. On Febuary 11, 2019, Officer Hargus did escort Eslick to the Shower, during the operations of Showers on 2C Range, with all other prisoners in G-house on 2C Range despite the fact that he was familiar with Eslick's history of being a threat and continued risk of assault to others; and did not secure him inside the Shower according to policy.

14

55. Captain Ruttan was personally familiar with as well as provided information to make him aware of the threat Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

56. Captain Gilley was personally familiar with as well as provided information to make him aware of the threat Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

57. Captain Boldman was personally familiar with as well as provided information to make him aware of the threat Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody

Staff, and Eslick's classification papers and mental health reports, emails or fax.

58. <u>Captain Rinehart</u> was personally familiar with as well as provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

59. <u>Lieutenant Shaver</u> was personally familiar with as well as provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

60. <u>Lieutenant McCutcheon</u> was personally familiar with as well as provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the

email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's classification transfer papers and mental health reports, emails or fax.

61. Lieutenant Hill was personally familiar with as well as provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

62. Lieutenant Simone was personally familiar with as well as provided information to make him aware of the threat and risk Eslick posed to those around him including Custody Staff and other inmates alike; through incident reports which are Circulated through the email system at the prison, as well as Conduct reports, threats to mental health and Custody Staff, and Eslick's Classification transfer papers and mental health reports, emails or fax.

## V. — FACTS SUPPORTING DELAY AND INTERFERENCE WITH ADEQUATE MEDICAL TREATMENT —

63. On Febuary 11, 2019, Nurse Moore-Groves was passing out Medication in G-cell house when the Plaintiff was stabbed by a Spear, by Estick who was inside the shower, as the Plaintiff was escorted pass the Shower by Sergeant Holmes.

64. Sergeant Holmes alerted Nurse Groves that the Plaintiff need medical treatment.

65. Nurse Groves observed my induries, yet told the Plaintiff, that She could not provide me with "any" treatment without the doctor's orders according to Wexford Health medical policy. Yet, She assured the plaintiff that She would email the doctor about the indury.

66. On Febuary 12, 2019, Dr. Talbot was in G-cell house Conducting doctor visits, however, he did not have me, the Plaintiff, on his list.

67. On Febuary 12, 2019, I talked to Case Work Manager Evans and he told me he had read an incident report about the Plaintiff being stabbed. This interest prompted the Plaintiff to show Mr. Evans my induries, at which point the Plaintiff asked him to help obtain medical treatment and a tetanus shot by Speaking to Dr. Talbot.

68. Mr. Evans told the Plaintiff that Dr. Talbot said he believed the Plaintiff needed a tetanus shot and would order one for the Plaintiff.

69. On Febuary 12, 2019, the Plaintiff asked Sergeant Sarten to help obtain medical treatment from Dr. Talbot.

70. Sergeant Sarten told the Plaintiff that Dr. Talbot said that tetanus shots needed to be given within twenty-four (24) hours. At this point I told Sergeant Sarten to tell Dr. Talbot that this was a recent incident and twenty-four (24) hours had not passed.

71. On Febuary 12, 2019, the Plaintiff asked Lieutenant McCutcheon to help me obtain Medical treatment from Dr. Talbot, which he immediately accomplished.

72. On Febuary 12, 2019, while conducting a visual and physical examination of the Plaintiff's Stab wound injury Dr. Talbot told the Plaintiff he believed a tetanus Shot; antibiotics; a blood draw done on the person who Stabbed the Plaintiff, Eslick, who is a Known hoarder and thrower of feces and urine, to see if he had a contagion or transmittable disease or virus which he could have transmitted to the Plaintiff; and a blood draw done on the Plaintiff to see if the Plaintiff had contracted hepititis or a

19.

Virus from the assault by Eslick'; and that he would immediately order the escort of the Plaintiff to the infirmary for an intestinal examination to check for internal injury because of the location of the injury, as well as all other treatments and test listed.

73. On Febuary 12, 2019, Lieutenant McCutcheon, Sergeant Sarten, and Dr. Talbot told me to get dressed and ready to be escorted to the infirmary.

74. On Febuary 12, 2019, Sergeant Sarten, after initially telling me to get ready to goto the infirmary asked Eslick to get ready to go to the infirmary. After Eslick initially refused, he agreed to go and was taken a head of the Plaintiff to the infirmary.

75. On Febuary 12, 2019, Sergeant Sarten told the Plaintiff that Eslick would go first and that the Plaintiff would go second to the infirmary when Eslick was returned to the unit.

76. On Febuary 12, 2019, when Eslick returned from the infirmary, Sergeant Sarten did not come get the Plaintiff to go to the infirmary. When Sergeant Sarten passed out meal trays the Plaintiff asked Sergeant Sarten When was

20

the Plaintiff going to be taken to Medical Sergeant Sarten
Said that he didn't know and he left at the end of
his Shift Without taking the plaintiff to Medical.

77. On Febuary 13, 2019, after hearing the Plaintiff
Complain about being denied Medical treatment Ryan Eslick
Stated that When he was taken to the infirmary Nurse
Carrie Stephens Said that no blood test or treatments
Would be given and that She, Director of Nursing Stephens,
Would send Someone to the cell house later in the week to
do blood draws and tetanus Shots/lab work.

78. On or about Febuary 13 or Febuary 14, 2019, I an
informal Complaint to Nurse Stephens about her denial and
interference with my medical treatment. I explained how I
had been Stabbed and had not received as much as any
topical treatment as a result of the failure to give me
any of the treatment the Dr. Talbot ordered.

79. On Febuary 14, 2019, when Nurse Lori Pancol was passing out
Medication in G-cell house I gave her the complaint letter to
give to Nurse Stephens who she Said was on duty that day.

21

80. On or about Febuary 14, 2019, an infection had begin to set in on my injury and as a result of the failure to give me any of the treatments the Dr. Talbot had order or any other treatment at all, although I had obviously been stabbed and custody, administrative and medical staff knew about it.

81. The Plaintiff had given Nurse Moore-Groves a Health Care Request Form on Febuary 11, 2019, requesting treatment for the stab wound injury after being told by her that she could not provide "ANY" treatment at all without the Doctor's order. On Febuary 14, 2019, the Plaintiff filed another health care request form reporting that an infection had set in, which caused nausia, headaches, rashes and hives and pain to set in on the stab injury that became inflamed.

## VI. – FACTS SUPPORTING UNNECESSARY INFLICTION OF PAINFUL TREATMENT.

82. On Febuary 16, 2019, the Plaintiff was complaining to custody staff about the injuries and was able to get them to alert Nurse Walker by providing her with yet another Health Care Request and the Plaintiff's verbal complaints.

83. On Febuary 16, 2019, Nurse Walker said that she would leave directions for the night shift medical staff to give the Plaintiff some treatment.

84. On Febuary 17, 2019, the night shift Nurse Groves told the Plaintiff that Nurse Walker told her or left her instructions for her to provide him with the tetanus shot that the Dr. Talbot had ordered Febuary 12, 2019, although she did not believe it would do any good because it should have been given with (48) Forty-eight hours of the assault injury. Nurse Groves told the Plaintiff that the tetanus shot would be painful because of the large size of the needle. The Plaintiff has then given the unnecessary, ineffective and painful tetanus shot.

85. During the later hours of Febuary 17, 2019, the pain from the tetanus shot had spread throughout the left side of the Plaintiff's body causing deep bone and nerve pain.

86. The Plaintiff spoke to Nurse Patric Davis who told the Plaintiff that he knows tetanus shots are painful; that protocol is to give them the same day of the injury and that tetanus shots should not be given a week later after the incident as my case had received.

87. On Febuary 20, 2019, the Plaintiff spoke to Nurse Query who told the Plaintiff that the deep-bone, nerve damage type

of pain I was experiencing from my arm (where the tetanus shot was given) to other parts of my body could be caused by the tetanus shot being given too close to the bone. She also told me that tetanus shots should be given within two (2) to (3) three day from the incident and that a tetanus shot given five (5) days later would be ineffective.

## FACTS SUPPORTING CORPORATE AND SUPERVISORY LIABILITY FOR PLAINTIFF'S MEDICAL CLAIMS

88. Plaintiff realleges and incorporates by reference paragraphs 65; 77-81.

88.(a) It has been and continues to be the policy, practice and custom of Wexford Health to deny, delay and interfer with the medical treatment of prisoners confined to the Indiana Department of Corrections and Pendleton Correctional Facility for the potential purpose of preserving the cost of treating prisoners including the Plaintiff.

89. The policy, practice and custom that prohibits nurses from providing any medical treatment without the doctor's orders; the run-around game between doctors and nurses, where the doctor orders the treatment only to have the nurses deny it only to

24

have the doctor turn a blind eye to the nurses' denial, although he is responsible for monitoring the delivery of health care services by the nurses; the failure to hire night time mental health staff, are all serious dangerous problems which have contributed to my injuries and pose future threats to my safety, health and wellbeing.

90. It has been the policy, practice and custom of the I.D.O.C. Commissioners to engage in contracting its responsibility to provide Mental and Medical health care treatment despite knowing that the Mental and Medical health care contractors knowingly engage in practices that are dangerous and threaten the safety, health and wellbeing of prisoners within the I.D.O.C.

91. Warden has knowingly turned a blindeye to the dangerous and unsafe policies, practices and customs of Wexford and its staff at the Pendleton Correctional facility.

92. An increase in litigation against I.D.O.C. and private Mental and Medical Health Care Contractors such as Wexford is the direct result of the Governor's, Commissioner's and Warden's knowing acquiescence to the dangerous policies, practices and customs of private Contractors like Wexford which have

25

become more harmful to prisoners since the Governors and employees of the I.D.O.C. have begun to outsource its responsibilities to provide care to profit corporations such as Corizon and now Wexford.

93.  The pattern and repeated practice of these Mental and Medical Health Care Contractors have repeated itself, and will continue to threaten prisoners' safety in Masses until the State entities and employees ceases its practice of Contracting to these Corporations because the goal of these Corporations is not to provide quality and consistent care to I.D.O.C. prisoners, such as the Plaintiff, however, the goal of these Corporations such as Wexford is to make profit at little Cost. As it cost to provide quality and consistent care to prisoners in the I.D.O.C., the safety, health and wellbeing of prisoners in the I.D.O.C. is inconsistent with Wexford's profit making model.

94.  The sheer amount of litigation and internal I.D.O.C. grievances have continually operated to inform the Warden Zatecky and Commissioner Carter of the dangerous policy, practices, and customs of Corporation like Wexford whose model

is to make profit at prisoners, such as the Plaintiff's expense and lost and injury.

95. On or about Febuary 18, 2019, I was called out for a "Chronic care" visit for astma; and I attempted to explain my latest stab wound injury / puncture wound related issues and injuries over my last sick call visit with <u>Nurse Graves</u> to <u>Dr. Talbot</u> as well as <u>Nurse Stephens</u> actions which led-up to the latest events.

96. When I tried to explain to <u>Dr. Talbot</u> that <u>Nurse Stephens</u> denied me the exact treatment he ordered, he told me, "Man, don't talk to me about Carrie Stephens ... She's not even at work, She done hurt her leg ... Can't even walk."

97. When I told <u>Dr. Talbot</u> that the "late" tetanus shot was causing me pain, he replied "Oh, man, thats just a lil' ol' needle ..." When I responded that it was painful, he interrupted me and told me that "the pain would go away."

98. On Febuary 18, 2019, I was unable to address my issues of pain to <u>Dr. Talbot</u>, So on Febuary 20, 2019, after talking to Nurse Query I filled out a health care request form explaining the pain I was having in my arm, shoulder

27

and a 1983 action in this cause I was still being denied the hepatitis test which I, the Plaintiff, as well as DR. Talbot believed I needed. Through the entire struggle and filing of Complaints I was in mental and emotional turmoil as a result of my fear of having had possibly contracted hepatitis.

104. On March 27, 2019, I filed a health care request form for mental health treatment explaining my fear of having contracted hepatitis and also explained how all my efforts to obtain treatment and a blood draw for hepatitis testing had failed, despite the fact that the Dr. Talbot Ordered this treatment/test On Febuary 12, 2019.

105. On March 28, 2019, Mental health Specialist Purdue Spoke to me and told me that he would see what he could do to address my concerns. On March 29, 2019, I received notice that I would be rescheduled for hepatitis testing.

# VII.

## ─ FACTS SUPPORTING MEDICAL AND FIRST AMENDMENT RETALIATION AND HARRASSMENT ─

106. Plaintiff realleges and incorporates by reference paragraphs 73 ─ 87; 95 ─ 98

106.(a) On Febuary 18, 2019, during my "Chronic Care" doctor visit for astma, each time I sought to address my stab wound injury related concerns Dr. Talbot deemphasized my medical concerns and once I, the Plaintiff, told him that no one was giving me any treatment or my astma medication, he then started to raise allegations that I had been smoking, which is prohibited in Pendleton Correctional Facility.

107. If I raised an allegation of medical denial he would respond with an allegation that I had smelled like smoke or had been smoking.

108. Despite his attempt to combat my allegations with counter allegations of illicit smoking I pressed foreward about the complications I was having as a result of the delayed, denied, and inadequate treatment. Dr. Talbot then started to become louder and more direct in his counters, at which point he ultimately told "Officer Shahata" that I had been smoking.

109. Dr. Talbot then asked Officer Shahata what he thought

30

about me Smoking. Officer Shahata responded that they were going to Shake-down (Search) my cell.

110. Shocked and angry at his game I persisted to ask about my lack lack of adequate treatment and raised the issue of the infection I had Suffered and he became more confrontational with me.

111. Pendleton Correctional Facility is a tobacco free facility, and Dr. Talbot sought to use the threat of Shake-downs and Staff pressure to silence my medical complaints and his actions were the reason Officer Shahata stated that they would Shake me down.

112. Finally, as I left the doctor's Visit; after all his efforts to avoid any dialogue about my untreated and worsened medical needs from being stabbed by a "spear"; with resulting complications from lack of treatment; when I was out of the doctor's office returning to my cell Dr. Talbot followed me out and made a comment to me about not "putting yo'" (my) belly against the Slots So people could poke you with things."

113. After Talbot's comments I associated his confrontation with about my efforts to get treatment and his attempts to get

31

me Shakendown due to my complaining about being stabbed and not being protected and not getting treatment. I understood that I was being retaliated against for both.

114. Ironically, as Dr. Talbot followed me out of the doctor's office onto 2C Range where my cell is and where Eslick's cell is the first cell on 2C Range; Eslick stuck a bottle of feces and urine out of his, still left opened cuff-port / food slot, as Dr. Talbot attempted to return to the doctor's office / medical exam room.

115. When Dr. Talbot saw Eslick with the bottle of feces and urine he paused in front of 3 and 4 cell on 2C range and alerted custody staff that Eslick had a bottle.

116. Eslick then attempted to spray the feces and urine on Dr. Talbot before custody staff could close his cuff-port / food slot. Dr. Talbot ran to get out of the way, obviously unaccustomed to the same threats prisoners like the Plaintiff experience daily, and as he turned on his heels and ran, the urine and feces landed in front of my cell and living area.

117. After Eslick's cuff-port / slot was closed and Dr. Talbot again stood in front of my cell, I told him, "ITS NOT SO

FUNNY NOW IS IT?" He then returned to the medical exam room and threatened Eslick saying "you better watch it" as he walked pass his cell which he had to do to leave off the front of the range.

118. On March 5th, 2019, after the Febuary 18, 2019, incident I heard Eslick yell for everyone to watch he does. (Which can only be done by the use of small hand held mirrors).

119. When Dr. Talbot walked near the front of the range where Eslick's cell is the first on the range near the medical exam room, Eslick threw or attempted to throw feces and urine on Dr. Talbot through his cuff-port/food slot, which again had still been allow to remain open as people walked pass or near his cell.

120. Around March 1, 2019, Offender Anthony Martin, a litigious prisoner, reported having someone beat on the wall behind his cell to disturb him. This coincided with custody staff attempting to force Martin, who was in the process of litigating with IDOC employees at Pendleton; to move to another cell as a result emergency orders by John Safford for "Administration" purposes. After refusing and being threatened with a Conduct report; on March 5, 2019, he was moved to the back of GC Range.

33

121. Martin had been engaging in dialogues over the range about lawsuits and his rights and the rights of prisoners and was moved because of this; Eslick was engaging in assaults and attempted assaults and was allowed to sit perfectly still. Martin was a witness in support of the plaintiff's complaint, Filed March 1st

122. On March 6, 2019, I was awaken by someone banging hard behind my cell on my wall, like Martin reported. I screamed to them "what"? In response the staff person behind my cell screamed for me to stop filing lawsuits.

123. On April 11, 2019, around (2) two to (3) three O'clock A.M. the Plaintiff was one(1) of only two (2) prisoners on 2C range who were both engaged in litigation with IDOC employees, and who were both subject to retaliatory and abusive strip searches and shakedowns. The other prisoner was Earlie Berry Jr., Case no. 1:18-cv-03651-JRS-MPB and Case no. 1:18-cv-01984-JRS-. The Plaintiff was forced to strip naked in extremely cold conditions, forced to stand barefooted on the filth-ridden floor of the shake-down/strip search booth, and had all the property in his cell dumped in a disorganized mess on his bed and across his cell, property was missing and it took the Plaintiff a week to reorganize his cell. This was extremely emotionally draining and psychologically

34

traumatic. This was a non-routine search meant to deter litigation.

124. The Plaintiff alleges now that Warden Zatecky, Deputy Warden Reagle, Deputy Warden Alsip; Captains Ruttan, Gilley, Rinehart, and Boldman; Major Conyers; Lieutenants Hill, McCutcheon, Shaver and Simone; and Commissioner Carter have properly failed in properly training the Staff members who engaged in these retaliatory actions and acts of harrassment, and for ordering and allowing shakedowns they are all liable.

# VIII.
# — FACTS SUPPORTING UNSAFE, UNSANITARY, COLD, DISFUNCTIONAL, INHUMANE LIVING CONDITIONS —

125. Plaintiff realleges and incorporates by reference paragraphs 36 — 62; 88(a)—94; 114-124

125(a). G-cell house is unique in that as a disciplinary unit it is also the only cell house to operate with the use of an outdated, unregulatable, steam operated heating system that produces the emission of black refuse, with poor ventilation that causes this emitted black refuse to be inhaled creating allergy and breathing and respitory problems; which also routinely can be expected to fail in the winter time resulting in near unbearable chillingly cold temperatures on 2C range where the Plaintiff had been housed.

126.. Offender Ryan Eslick is the most volatile and disruptive of a host of prisoners with a history of extreme Mental health issues, whom the Plaintiff can best describe as "Psycho traumatic" assaulters; Offenders whose Shocking and disruptive behavior has deep and long lasting harmful, traumatic, Psychologically injurious impact on those around them, including the Plaintiff, Griffin.

127. These "psychotraumatic" offenders with Eslick being most prominent, repeatedly engage in throwing feces and urine in and around the immediate eating, sleeping and living confines of others, including, the Plaintiff, Griffin.

128. These "psycho traumatic" offenders with Eslick being most prominent, Constantly beating and kicking on their bars and doors creating unsettling noise, in and around the immediate eating, sleeping, and living confines of others, including, the Plaintiff, Griffin.

129. These "psychotraumatic" offenders with Eslick being most prominent Constantly engage in yelling and Screaming insults and threats in noisey disruptions and disturbances in and around the immediate eating, sleeping and living confines of others, including the Plaintiff, Griffin.

130. These "psycho traumatic" offenders have used flooding their toilets, causing sewage to invade the living spaces of others, including, the Plaintiff, Griffin.

131. These "Psycho traumatic" offenders with Eslick **being** the most prominent has **repeatedly** engaged in self-mutilation near and around the immediate living spaces of others, including, the Plaintiff, Griffin.

132. The Pendleton Correctional Facility Warden and policy does not provide proper clothing to deal with the ineffective heating system and the cold conditions.

133. The connection between the unsafe and unsanitary, disfunctional and inhumane created by Eslick, and others,

is the lack of attention, care, counseling and opportunities for socializing, and mental health treatment.

134. Custody staff have routinely avoid their mandatory observations of Eslick and those like him.

135. Avoiding their routine observations of these "Psychtraumatic" offenders have resulted in a shift of burden from custody staff to other inmates, including, the Plaintiff, Griffin; to have to provide management these "psychotraumatic" offenders, in order to avoid the outburst, disturbances, threats and assaults, the throwing of feces and urine, the beating and kicking, the yelling and screaming, the flooding and self-mutilation.

136. Despite knowing very well the type of threat Eslick poses, staff have continued to fail to provide the proper safety and security by taking Eslick to the showers with everyone else, still, and leaving him unsecured in the shower, as well as in his cell when other prisoners, such as the Plaintiff, Griffin, have to walk pass his cell or shower in order to shower, which, policy prescribes according to R.C.F. operational procedure 02-01-111.

137. During 2018 "Dr. Roger Perry" was Lead Psychologist and the person "Dr. Ciemone Easter-Rose" refered me to Dr. Perry for consultation because of complaints to Mental Health about my deteriorating Mental Condition and erratic brain activity I was experiencing.

138. During 2018 Me, the Plaintiff, Griffin, and "Dr. Perry" conducted a mental health interview and I told him I was having what I could only explain as agonizing and irradict brain activity with uncontrollable impulses, urges and random thoughts.

139. I asked "Dr. Perry" to send me to a unit where I could get mental health treatment before my deteriorating conditions worsened and became permanent.

140. "Dr. Perry" told me that State employees and Mental health professionals have State wide conferences weekly or monthly, about the people who needs help and they are very selective about who they give treatment to. He said that it is hard to give people the treatment we needed because the I.D.O.C. and the Medical Health Care Contractor "Wexford Health", both, prioritize money, bed space and staffing

above giving prisoners, confined to segregation/Restrictive Status Housing, the treatment and care needed for Mental health treatment.

141. "Dr. Perry" told me thats why he was happy to be retiring, attempting to express false empathy for a pattern and practice he helped establish or helped put into practice.

142. "Dr. Perry" told me that he would give "Dr. Easter-Rose" a report about helping me get better Mental health treatment.

143. The next time I saw and spoke to "Dr. Easter-Rose" in 2018 in G-Cellhouse She told me "Dr. Perry" had retired without leaving her any report about providing me treatment.

144. "Dr. Easter-Rose" confirmed the things "Dr. Perry" had told me and said that Staffing and limited bed Space prevented many of us from getting the treatment we needed in the Restrictive Status Housing Unit.

145. The failure of the collective Mental health Staff to fulfill their role of providing proper treatment creates an environment where "psychotraumatic" offenders express psychic distress negatively in order to relieve their mental health

and intensive care needs; thus creating an unsafe, unsanitary, disfunctional, and inhumane environment.

146. The failure of the collective Indiana Department of Corrections officials and employees named herein, as defendants and nondefendants, both named and unnamed; to fulfill their role of providing proper attention, treatment, care, and observation; creates an environment where "psychotraumatic" offenders such as Eslick expresses themselves negatively creating an unsafe, unsanitary, disfunctional, inhumane and cold environment.

147. I, the Plaintiff, Griffin, have been mentally and emotionally held double captive to the mental needs of those "psychotraumatic" offender, by having to constantly talk to them about the obsessive concerns and provide them social attention for their obsessive needs in order to avoid the trauma and turmoil that's a product of their shocking routine outburst, disruptions, including spontaneous threats and assaults, such as the as on me, the Plaintiff, Griffin.

# IX. EXHAUSTION OF LEGAL REMEDIES

148. Plaintiff, Griffin, used the prison grievance procedures available to him to try and address his problems by presenting the facts relating to this Complaint, despite affirmative acts of misconduct and policy violations of staff to obstruct access to grievance Procedures.

# X. LEGAL CLAIMS

149. Plaintiff realleges and incorporates by reference paragraphs 1-148

149.(a) Defendants Carter, Osburn, Executive director of Classification, Deputy Commissioner of Operations, Zatecky, Reagle, Alsip, Safford, Evans, Conyers, Ruttan, Gilley, Boldman, Rinehart, Shaver, McCutcheon, Hill, Simone, Ernest, Holmes, Fish, Hargus, Easter-Rose, Perdue, in deliberate indifference failed to protect the plaintiff from being assaulted by another incarcerated-person which violated Plaintiff, Virgil Griffin's, rights and Constituted Cruel and Unusual punishment in Violation of the Eighth Amendment and Fourteenth Amendment Of the United States Constitution, resulting in physical, mental and emotional pain and suffering.

150. Defendants Carter, Zatecky, McCutcheon, Sarten, Wexford Health(Corporation), Talbot, Stephens, Groves, in deliberate indifference denied, delayed and interfered with adequate Medical treatment which violated Plaintiff, Virgil

42

Griffin's, rights and Constituted Cruel and Unusual punishment in Violation of the Eighth Amendment and Fourteenth Amendment of the United States Constitution, resulting in physical, mental and emotional pain and Suffering.

151. Defendants Zatecky, Talbot, Carter, Wexford Health (Corporation), Walker, Groves, in deliberate indifference intentionally inflicted Unnecessary painful treatment which Violated Plaintiff, Virgil Griffin's, rights and Constituted Cruel and unusual punishment in Violation of the Eighth Amendment and Fourteenth Amendment of the United States Constitution, resulting resulting in physical, mental and emotional pain and Suffering.

152. Defendants Carter, Zatecky, Reagle, Alsip, Conyers, Ruttan, Gilley, Boldman, Rinehart, Shaver, McCutcheon, Hill, Simone, Ernest, Talbot, in retaliation and harrassment against the First and Eighth Amendments enforcement efforts of the plaintiff Violated Plaintiff, Virgil Griffin's, rights and Constituted Cruel and unusual punishment and denial of access to the Courts in Violation of the First, Eighth and Fourteenth Amendments of the United States Constitution, resulting in physical, mental and emotional pain and Suffering.

153. Defendants Carter, Osburn, Executive Director of Classification, Deputy Commissioner of Operations, Zatecky, Reagle, Alsip, Safford, Evans, Conyers, Ruttan, Gilley, Boldman, Rinehart,

Shaver, McCutcheon, Hill, Simone, Ernest, Holmes, Fish, Hargus, Wexford Health (Corporation), Perry, Easter-Rose, Perdue, in Subjecting the Plaintiff to Unsafe, Unsanitary, Cold, disfunctional and inhumane living Conditions which Violated Plaintiff, Virgil Griffin's, rights and Constitutes Cruel and Unusual Punishment in Violation of the Eighth Amendment and Fourteenth Amendment of the United States Constitution, resulting in physical, mental and emotional pain and Suffering.

154. The plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irreparably indured by the Conduct of the defendants unless this Court grants the declaratory and indunctive relief which plaintiff seeks.

## XI. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this Court enter Judgment granting plaintiff:

155. A declaration that the acts and omissions described herein Violated Plaintiff's rights under the Constitution and laws of the United States.

156. A preliminary and permanent indunction ordering defendants Carter, Osburn, Executive Director of Classification, Deputy

Commissioner of operations, Zatecky, Reagle, Alsip, Safford, Evans, Conyers, Ruttan, Gilley, Boldman, Rinehart, Shaver, McCutcheon, Hill, Simone, Ernest, Holmes, Fish, Hargus, Wexford Health (Corporation), Perry, Easter&Rose, and Perdue to cease their acts and omissions which creates and condones unsafe, unsanitary, cold, disfunctional and inhumane living conditions; and to make greater efforts to provide adequate mental health treatment, nighttime mental health staff, more direct personal attention and social opportunities for people confined to Restrictive Status Housing Units. Defendants Carter, Zatecky, to make every effort to eliminate the control and management of Mental and Medical Health Care Service responsibilities by private profit making entities such as Wexford Health. Defendants Carter, Zatecky, Conyers, Reagle, Alsip, Ruttan, Gilley, Boldman, Rinehart, Shaver, McCutcheon, Hill, Simone, Ernest, Talbot to cease all retaliation and acts of harrassment and to make every effort to eliminate all inclinations of retaliation and harrassment by Indiana Department of Corrections employees.

157. Compensatory damages for each claim and injury in the amount of ($50,000) Fifty-Thousand Dollars against each

defendant, jointly and severally, for each act and omission.

158. Punitive damages for each claim and injury against each defendant, for each act and omission, in the amount of ($50,000) Fifty-Thousand Dollars.

159. A jury trial on all issues triable by jury.

160. Plaintiff's cost in this suit.

161. Any additional relief this Court deems just, proper and equitable.

Dated: May 27, 2019
                    Respectfully Submitted,

                        Virgil Griffin
                        #998996; J3-3F
                        4490 W. Reformatory Rd.
                        Pendleton, Ind. 46064

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein ARE TRUE, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

        Executed at Pendleton, Indiana on May 27, 2019

                Virgil Griffin
                Virgil Griffin

46

United States District Court
Southern District of Indiana

Virgil Griffin,
　　Plaintiff,

　　V.

R. Carter, et al,
　　Defendants.

Case No. 1:19-CV-00882-JPH-MPB

# ATTACHED AUTHENTICATED DOCUMENTARY EVIDENCE IN SUPPORT OF FAILURE TO PROTECT FROM ASSAULT CLAIM IN AMENDED COMPLAINT

Comes now, Plaintiff, Virgil Griffin, pro se, pursuant Fed. R. Evid. and Fed. R. Civ. P. and states that the following documents in support of failure to protect from assault in the Amended Complaint are authentic and accurate:

1. Incident Report by Sergeant Holmes showing that Plaintiff was stabbed by Eslick during showers in the shower area.

2. Email of Incide Report by Lieutenant Shaver showing that Plaintiff was assaulted and the practice of circulating emails of incident reports.

3. Declaration of Ryan Eslick showing that he warned custody and Mental health staff (amongst others) that he would stabbe people.

4. Declaration of Dontay Martin showing that Martin Perdue admitted that Eslick warned him and that he recorded this warning.

1

5. Declaration of Chris Conwell showing that Lieutenant Ernest admitted that Eslick warned him.

6. Declaration of Anthony Martin showing that Sergeant Holmes was aware of the threat Eslick posed to those around him.

7. Pendleton Correctional Facility policy directing staff to secure each person confined to Restrictive Housing in the shower before escorting the next person.

I, Virgil Griffin, affirm under penalty of perjury that the foregoing representations are true and that the attached documents are authentic.

Virgil Griffin

Respectfully Submitted,

Virgil Griffin

State Form 7212 (R/12-88)

Department of Correction
Incident Report Form

Date:_____2-12-2019_____      Time:___2:45 AM_____

Type of Incident-Check One:          Name & Number of Offender/Employee Involved:

Escape & Attempt Escape      _____     _____

Injury or Sickness           __X__       _____Offender Eslick, Ryan #121550_____

Disturbance                  _____     _____Offender Griffin, Virgil #998996_____

Damage to Property           _____     _____

Unauthorized Traffic         _____     _____Sgt. J. Holmes_____

Special Off Grounds          _____     _____
   (Hospital Run)
Other                        _____     _____

DESCRIPTION OF INCIDENT:

  On 2-11-2019, at 9:30pm, Sergeant J. Holmes (B/M) was escorting offender V, Griffin # 998996 from the showers on the
bottom range of GCH. As we passed Offender R. Eslick # 121550 shower, Offender Eslick stuck a pen out the cuff port and
stabbed Offender Griffin in the side. After the incident offender Griffin was placed in a shakedown booth and evaluated by
medical staff. Offender Eslick was removed from the shower and placed back in his cell. No injuries were reported to this office.
Offender Eslick was charged with a 102. No further incident occurred.

LOCATION WHERE INCIDENT TOOK PLACE:

_____GCH Shower area_____

NOTIFICATION OF OFFICIAL AND TIME:

Supervisor or Department Head:_____LT. SHAVER_____ Time:_____2:15 AM_____

Asst. Supt. or Supt.:_____ Time:_____

Other:_____ Time:_____

Action Taken:

_____Offender Griffin 998996 was seen in medical and cleared to return to his cell. Offender Eslick was

written up on a 102. RDC # 2019-02-068.    Duty officer notified via email.

Incident report is to be completed and forwarded before leaving institution.

NAME OF PERSON MAKING REPORT & DEPT.:

 __Sergeant J. Holmes_____

Witness if Applicable:

_____

cc:    Superintendent
       Assistant Superintendents
       Custody Supervisor
       Department Head

Shepherd, Veyona

| | |
|---|---|
| **From:** | Shaver, Joshua J |
| **Sent:** | Tuesday, February 12, 2019 3:05 AM |
| **To:** | Alsip, Duane; Amburn, Sara; Ash, Lisa K; Bagienski, Andrew J; Baker, Louie; Ballenger, Jeff D; Bodkin, Laura R; Boldman, Jim; Breen, Michael P; Bynum, Curtis L; Caylor, Michael E; Cochran, Ryan; Colestock, Elizabeth; CONYERS, MIKE; Cooke, Christina; Cooperider, Casey D; Counceller, Harold; Dickson, Paula J; Easter-Rose, Ciemone S; Eden, Penny; Enos, Lydia; Ernest, Jason; Estep, Jennifer Ann; FOWLER, LARRY; Frame, William P; Gilley, Jerry; Hill, Steven M; Hinshaw, Vedora (DOC); Houchins, Charles; Kardis, Emily A; Kent, Wade; King, Michael; LaFlower, Michelle L.; Lommel, Amber; Long, Aaron; Love, Jessica D; Malott, Jeffrey; Mason, David; Maxwell, Summer; McCutcheon, Joseph; Mcgregor, Lola B; Mckamey, Joshua A; Myers, Carolyn; Napper, Sarah; Nelms, Christina; Peterson, Pete; Rains, Michelle O (ISR); Reagle, Dennis; Riggle, Timothy L; Rinehart, Charles; Rinehart, Jennifer; Ruttan, Jeremy; Safford, John; Sallee, Emily L; Sanders, Kate J; Schott, Shannon; Shaver, Joshua J; Shepherd, Veyona; Simone, Kathleen M; Smith, Aaron; Spears, Gerard; Stanley, Vincent; Stephens, Carrie D; Stultz, Hannah; Thompson, David R. (ISR); Turney, Brock; Williams, Don; Wyatt, Sean; Zatecky, Dushan |
| **Subject:** | Griffin /Eslick 2-12-19 |
| **Attachments:** | Incident Report Eslick-Griffin.docx; RDC report Eslick-Griffin.docx |

On 2-11-2019, at 9:30pm, Sergeant J. Holmes (B/M) was escorting offender V. Griffin # 998996 from the showers on the bottom range of GCH. As we passed Offender R. Eslick # 121550 shower, Offender Eslick stuck a pen out the cuff port and stabbed Offender Griffin in the side. After the incident offender Griffin was placed in a shakedown booth and evaluated by medical staff. Offender Eslick was removed from the shower and placed back in his cell. No injuries were reported to this office. Offender Eslick was charged with a 102. No further incident occurred.

Offender Griffin 998996 was seen in medical and cleared to return to his cell. Offender Eslick was written up on a 102. RDC # 2019-02-068.     Duty officer notified via email.

Lieutenant J. Shaver
K Bracket Assistant Shift Supervisor
Pendleton Correctional Facility /ISR

1

Declaration of:
Ryan Eslick
# 121550

RYAN. L. ESLICK

ON FEBRUARY 12th 2019 DR P. TALBOT had ORDERED ME AND OFFENDER GRIFFIN a TETANUS Shot and IN the AFTERNOON I was ESCORTED BY INFIRMARY OFFICER TYLER to URGENT CARE, UPON OFFENDER ESLICK AND OFFICER TYLER'S ARRIVAL IN URGENT CARE NURSE CARRIE STEPHENS Said THERE AINT GOING to BE any TETANUS Shots GIVEN toDAY and that A NURSE WOULD BE SENT to G CELLHOUSE to Do tetanus Shots to Both OFFENDERS NURSE CARRIE STEPHENS SAID BECAUSE 'I Got MUCH BETTER thINGS to DO'

I, Ryan L. Eslick, declare under penalty of perjury that the foregoing is true and correct.
Executed at Pendleton, Ind. On Febuary 13th 2019

Ryan. L. eslick
Signature of Declarant

DECLARATION OF:

Dantay D. Martin

# 149487

I, Dantay D. Martin Hereby Declares: On February 18, 2019 I did hear my cell neighbor Griffin ask the Mental Health Specialist, Mr. Perdue if he Knew Ryan Eslick had serious mental health problems, which Perdue replied "yes" Griffin asked him (Perdue) if he was aware that Ryan Eslick had previously assaulted another inmate, to which Perdue replied in the positive again, Griffin further asked if Ryan Eslick told him (Perdue) he would stab someone and if so did he (Perdue) report it in his files. Mr. Perdue said "yes" to both questions. Griffin then detailed how he was stabbed/assaulted by Eslick and inquired about why Eslick was not moved. I heard Mr. Perdue blame custody staff and say "mental health did their part", it was central office who did not move Eslick yet.

I, Dantay D. Martin, declare under penalty of perjury that the foregoing is true and correct.

Executed at Pendleton, Ind. On Febuary 18, 2019

Dantay D. Martin

Declaration of:

Chris Conwell
#198352

I o Chris Conwell , hereby declares: On 2/18/19 I heard Ryan
Eslick tell <s>to</s> Lt. Ernest (Earnest) did he hear about him stating he was
gone stab someone & he said yes and then that did he know
he requested mental health treatment & he stated yes & that
did he hear of him stabbing someone & he stated yes.
I was located in cell 1 on 4C at the time.

I, Chin.conwell , declare under penalty of perjury that the
foregoing is true and Correct.
EXecuted at Pendleton, Ind. On Febuary 18th, 2019

Chris Conwell
Signature of Declarant

Declaration of:

Anthony Martin

# 945288

I, Anthony Martin hereby declares: that I heard Sgt Holmes make comments to offender Westin about an inmate name Ryan Estick and his prior assaults to and on other offenders. Sgt Holmes stated that offender Estick was to be kept "seperte" from everybody, and that other staff also know that and was aware of his status. This conversation happened on Febuary 16, 2019

I, Anthony Martin, declare under penalty of perjury that the foregoing is true and correct.
Executed at Pendleton, Ind. on Febuary 18, 2019.

Signature of Declarant

| PENDLETON CORRECTIONAL FACILITY | | | |
|---|---|---|---|
| OPERATIONAL PROCEDURE 02-01-111 | USE AND OPERATION OF ADULT OFFENDER ADMINISTRATIVE RESTRICTIVE STATUS HOUSING | ORIGINAL DATE: 09-01-08 REVIEW DATE: 03-24-15 | Page 11 of 18 |

Orders with remittance slips may be submitted at any time in the month, through facility mail, however, orders will be sent to offender trust on the last Wednesday of the month for processing.

Once items are received, they will be delivered with in a timely fashion to the offender. The offender must provide his ID and sign for the order before he maintains possession of the supplies.

Only orders for the vendors listed below will be accepted. The offender is responsible for obtaining a copy of the current catalog for himself, by contacting these approved vendors. Approved Vendors are: "Nasco 901 Janesville Ave. Fort Atkinson, WI 53538" or "Dick Blick 864 Enterprise Ave. Galesburg, IL 61401"

C. Each offender shall receive the same meal provided the general population. Bulk food containers shall be sent to the unit and served by Food Service Personnel out of the unit warming kitchen. The food shall be placed in Styrofoam serving trays. Trays shall be delivered by unit custody staff to each offender's cell. Based on the security needs of the unit, SUBSTITUTE FOOD ITEMS SHALL BE INDICATED IN THE UNIT LOG.

D. Offenders shall retain the privilege of the mail service as presented in Policy 02-01-103, "Offender Correspondence". The amount of correspondence that an offender may possess, at any one time, may be limited in accordance with the Pendleton Correctional Facility Operational Procedures for 02-01-103, "Offender Personal Property".

E. Each offender shall retain the privilege of visitation as presented in Policy 02-01-102, "Offender Visitation". Visits shall take place in a partitioned area or an area designated for this purpose. At a minimum, an offender shall be allowed two (2) visits per month. The area may be a non-contact visit setting. These offenders shall be escorted to the visiting area in full restraints. Chain, Black Box, and Handcuffs are removed for the visit. Leg restraints remain on throughout the visit. If a special visit is granted that allows a contact visit to take place the offender will remain in full restraints.

F. Offenders shall retain telephone privileges in accordance with Policy 02-01-105, "Telephone Privileges".

1. Offenders shall be given access to a cordless phone in cell every other day.

2. Unit staff shall monitor this activity to ensure equal time for each group making phone calls (thirty (30) minutes per call).

3. Phone calls are a privilege and as such, may be restricted by unit staff or the Disciplinary Hearing Officer for poor conduct. Restrictions shall be documented on the offender unit record and SF 16050, "Adult Restrictive Status Housing Restrictions Report".

4. Replacement of a range phone found to be purposely damaged can take a significant

---

| PENDLETON CORRECTIONAL FACILITY | | | |
|---|---|---|---|
| OPERATIONAL PROCEDURE 02-01-111 | USE AND OPERATION OF ADULT OFFENDER ADMINISTRATIVE RESTRICTIVE STATUS HOUSING | ORIGINAL DATE: 09-01-08 REVIEW DATE: 03-24-15 | Page 12 of 18 |

amount of time. Access to a phone during this time period may be heavily restricted or cancelled during this time.

G. Each offender shall retain the right of access to legal materials in accordance with Policy 00-01-102, "Offender Access to the Courts".
An offender's access to legal reference material may be in hard copy or electronic format. If the material is an electronic format, the facility shall ensure that the offender is instructed how to access and use the material. The facility may limit the amount of legal material that an offender may possess in the living area. This limit shall be based upon the amount of space available to the offender and the property room or other suitable secure location. If the facility stores an offender's excess legal material, it shall ensure that the offender may have access to these materials within two (2) working days of the offender's requests.

1. For assistance from the Law Library an offender should send a written request to the Law Library Supervisor requesting specific information, copies, and supplies.

2. One (1) offender shall be assigned from the Law Library for the purpose of visiting the unit one (1) day a week. Additional visits by the clerk may be permitted when special circumstances warrant such arrangements (i.e., court deadlines or other legitimate conditions).

3. Most of the offender requests shall be answered by the facility mail system; but, upon specific direction of the Law Library Supervisor, the offender Law Library clerk shall deliver requested materials, copies, and supplies, and answer any questions from the offender. Upon request, a reasonable number of law book copies shall be provided free to the offender.

H. Each offender shall be afforded a minimum of one (1) hour of physical recreation, outside of the immediate living area (cell), five (5) days per week. The recreation periods are provided in an outside recreation pen unless safety or security considerations dictate otherwise. This is not to include the ten (10) hours a week of out of cell time for the offenders with Mental Illness.

I. Each offender is allowed to shower at a minimum of 3 times per week in approximately ten (10) minute blocks of time on the PM shift. Unit custody staff shall escort no more than one (1) offender at a time to the shower area. Once the offender is secured in the shower another offender may be escorted to the next shower until all showers are complete. The time shall not be counted against any other out-of-cell activity.

J. Each offender shall be offered general personal services at the same frequency as provided to other offenders.

Visitation..........................Every 14 days
Telephones.........................Every other day
Legal materials....................Request slip to the Law Library

**Left Panel:**

| PENDLETON CORRECTIONAL FACILITY | | |
|---|---|---|
| OPERATIONAL PROCEDURE 02-01-111 | USE AND OPERATION OF ADULT OFFENDER ADMINISTRATIVE RESTRICTIVE STATUS HOUSING | ORIGINAL DATE: 08-01-08   ORIGINAL REVIEW DATE: 03-24-15   Page   9   of   18 |

Housing Unit is given a Classification Hearing which provides the written means (SS 3412, Report of Classification Hearing) to document his assignment to an Offender Housing Unit, reason(s) for the assignment, and the facility's eligibility criteria for a work assignment.

IX. **RELEASE FROM DEPARTMENT-WIDE RESTRICTIVE STATUS HOUSING:**

A. An offender who has been assigned to a Department-Wide Administrative Restrictive Status Housing Unit shall be released only with the approval of the Executive Director of Adult Facilities or the Deputy Commissioner of Operations.

B. If staff at the Department-Wide Administrative Restrictive Status Housing Unit believes that an offender is ready for release, staff shall prepare a written recommendation for the offender's release.

C. Prior to submitting a recommendation to release an offender from Department-Wide Administrative Restrictive Status Housing Unit staff shall review the offender's Case Plan and other pertinent documentation to determine the need for continued restrictive status housing.

D. This recommendation shall be forwarded to the Facility Head for review.

E. If the Facility Head agrees with the recommendation, the facility head shall forward the recommendation to the Executive Director of Adult Facilities for review and approval.

F. The Executive Director shall consult with the Deputy Commissioner of Operations and the Director of Classification to render a final decision on whether the offender will be transferred.

G. Offenders released from a Department-Wide Administrative Restrictive Status Housing Unit and not to shall only be released to a facility Administrative Restrictive Status Housing Unit or to the general offender population.

**Mental Health Release:**

A. If, as a result of the mental health evaluation, mental health staff determines that the offender is seriously mentally ill, the offender shall be transferred within 72 hours of the determination to an appropriate facility where he can obtain needed mental health treatment, unless a psychiatrist determines, after a face-to-face evaluation, that the offender cannot be safely moved for mental health reasons. In such a case, the offender shall be moved to the appropriate facility as soon as the psychiatrist determines that it is medically safe to move the offender.

X. **CONDITIONS OF THE ADMINISTRATIVE RESTRICTIVE STATUS HOUSING UNIT:**

Facility and Department-Wide Administrative Restrictive Status Housing Units shall ensure that certain rights and privileges are provided to offenders housed in the Administrative Restrictive Status Housing Units).

**Right Panel:**

| PENDLETON CORRECTIONAL FACILITY | | |
|---|---|---|
| OPERATIONAL PROCEDURE 02-01-111 | USE AND OPERATION OF ADULT OFFENDER ADMINISTRATIVE RESTRICTIVE STATUS HOUSING | ORIGINAL DATE: 08-01-08   ORIGINAL REVIEW DATE: 03-24-15   Page   10   of   18 |

Offenders shall be notified when a female individual is in the unit, and shall log the presence and announcement in the unit log book.

Offenders on the Administrative Restrictive Status Housing Unit shall have a reduced amount of clothing issued to them due to idle activity. The amounts are as follows:

A. **Administrative/Department-Wide Restrictive Status Housing Clothing:**

State issued clothing shall be the only clothing allowed on the unit. Outerwear shall be State-issued one (1) red jumpsuit. Shoes shall consist of state issued gym (tennis) shoes or shower shoes. Offenders assigned to the Administrative Restrictive Status Housing Unit shall be permitted to retain the following State-issued clothing items in their cells in the amounts indicated:

1. three (3) pair of under shorts
2. three (3) pair of socks
3. three (3) T-shirts
4. one (1) pair of tennis shoes
5. one (1) pair of shower shoes
6. two (2) towels
7. two (2) washcloths
8. one (1) khaki coat (Seasonal)
9. one (1) green knit cap (Seasonal)
10. one (1) pair of cotton gloves

B. All other property shall be the same as the General Population. Administrative Restrictive Status Housing and Department-Wide Restrictive Status Housing Offenders are allowed a limited amount of arts and crafts to be retained in their assigned bed locations. They are as follows:

1. two (2) Sketch pads:
   - No spiral binding
   - No larger than 24" x 18"
   - No red, blue, onion, origami, or tracing paper
   - No more than 1 ream (500 sheets)
2. 50 Pastel Chalk pieces
3. 50 Colored pencils
4. 1 Pencil Sharpener
5. 1 Eraser

Spending limit will be $40.00 per month for the total item order – this will not include shipping & handling or taxes.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VIRGIL GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00882-JPH-MPB |
| | ) | |
| R. CARTER, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Granting Motion to Correct Possible Erroneous Attached Documentary Evidence,
Screening Fifth Amended Complaint and Dismissing Insufficient Claims,
and Directing Further Proceedings**

**I.     Granting Motion to Correct
Possible Erroneous Attached Documentary Evidence**

The plaintiff's "motion to correct possible erroneous attached documentary evidence," dkt.

[27], is **granted**. The Court will treat the documents attached to the plaintiff's motion as exhibits

attached to the fifth amended complaint.

**II.     Screening of the Complaint**

**A.     Screening Standard**

Plaintiff Virgil Griffin is an inmate currently incarcerated at Pendleton Correctional

Facility. Dkt. 28. Because the plaintiff is a "prisoner" as defined by 28 U.S.C. § 1915A(c), this

Court has an obligation under 28 U.S.C. § 1915A(a) to screen his complaint before service on the

defendants. Pursuant to 28 U.S.C. § 1915A(b), the Court must dismiss the complaint if it is

frivolous or malicious, fails to state a claim for relief, or seeks monetary relief against a defendant

who is immune from such relief. In determining whether the complaint states a claim, the Court

applies the same standard as when addressing a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017). To survive dismissal,

> [the] complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pro se complaints such as that filed by the plaintiff are construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015).

### B.    Plaintiff's Complaint

On March 1, 2019, Mr. Griffin initiated this case under 42 U.S.C. § 1983 alleging various violations of his constitutional rights. He names thirty-one defendants: (1) Robert Carter; (2) Michael Osburn; (3) Dushan Zatecky; (4) Dennis Reagle; (5) Duane Alsip; (6) John Safford; (7) Chad Evans; (8) Mike Conyers; (9) Jeremy Ruttan; (10) Jerry Gilley; (11) Jim Boldman; (12) Charles Rinehart; (13) Joshua Shaver; (14) Joseph McCutcheon; (15) Steven Hill; (16) Kathleen Simone; (17) Jason Ernest; (18) Jerry Holmes; (19) Sergeant Sarten; (20) Officer Fish; (21) Officer Hargus; (22) John Doe, Executive Director of Classification; (23) John Doe, Deputy Commissioner of Operations; (24) Roger Perry; (25) Ciemone Easter-Rose; (26) Martin Perdue; (27) Paul Talbot; (28) Carrie Stephens; (29) Brittany Moore-Groves; (30) Nurse M. Walker; and (31) Wexford Health. He sues all of the defendants in both their individual and official capacities. He seeks injunctive relief and compensatory and punitive damages.

Mr. Griffin alleges that, on February 11, 2019, inmate Ryan Eslick stabbed him with a "spear."[1] Dkt. 28 at 10. This occurred while Mr. Eslick was in the shower and Mr. Griffin was passing by the shower. Mr. Griffin alleges that, prior to this incident, Mr. Eslick had warned Lieutenant Ernest, Mental Health Specialist Perdue, and Dr. Easter-Rose that he would assault

---

[1] Although Mr. Griffin claims that he was stabbed with a spear, the documents attached as exhibits to his complaint indicate he was stabbed with a pen. *See* dkt. 27-1 at 3, 4, 6.

2

people and continue to escalate his assaults until he was provided appropriate mental health treatment. He also contends that Sergeant Holmes, Officer Fish, and Officer Hargus knew of Mr. Eslick's "history of being a threat and continued risk or assault to others," yet chose not to separate him from the other inmates for showering. Dkt. 28 at 11, 14.

Mr. Griffin alleges that several defendants knew of the "threat and risk [Mr.] Eslick posed to those around him" through incident reports, conduct reports, threats made by Mr. Eslick to mental health and custody staff, and Mr. Eslick's "classification transfer papers and mental health reports." Dkt. 28 at 11-17. These individuals include Case Work Manager Evans, Unit Team Manager Safford, Deputy Warden Reagle, Deputy Warden Alsip, Warden Zatecky, Regional Director Michael Osburn, Indiana Department of Correction ("IDOC") Commissioner Robert Carter, the IDOC Executive Director of Classification, the IDOC Deputy Commissioner of Operations, Captain Ruttan, Captain Gilley, Captain Boldman, Captain Rinehart, Lieutenant Shaver, Lieutenant McCutcheon, Lieutenant Hill, and Lieutenant Simone.

After the incident, Sergeant Holmes notified Nurse Moore-Groves of Mr. Griffin's injuries, but Nurse Moore-Groves said she could not provide any treatment without a doctor's orders. The next day, February 12, 2019, Dr. Talbot conducted doctor visits but refused to see Mr. Griffin because he was not on the list. Mr. Griffin then spoke with Mr. Evans, Sergeant Sarten, and Lieutenant McCutcheon about receiving medical treatment. Later that same day, Dr. Talbot evaluated Mr. Griffin and recommended a tetanus shot, antibiotics, and a blood draw to determine whether Mr. Griffin had contracted any contagious diseases. Mr. Griffin alleges that Dr. Talbot, Lieutenant McCutcheon, and Sergeant Sarten told him to get ready to go to the infirmary, but Sergeant Sarten failed to take him.

On February 13, 2019, Mr. Griffin complained to Nurse Stephens, and she said she would send someone "later in the week to do blood draws and tetanus shots/lab work." Dkt. 28 at 21. Mr. Griffin submitted a complaint form the next day about the failure to provide the tetanus shot, and he alleges that "an infection had begin to set in." Dkt. 28 at 22.

Five days after the incident, on February 16, 2019, after more complaints about the alleged denial of medical care, Nurse Walker indicated she would leave instructions for the nighttime medical staff to provide treatment to Mr. Griffin. Nurse Moore-Groves administered a tetanus shot to Mr. Griffin on February 17, 2019. She warned him that it might not be effective because it was not given within forty-eight hours of the incident and that it would hurt. Mr. Griffin alleges that the shot caused "deep bone and nerve pain" and that another nurse advised him that the pain might be caused by the tetanus shot being given "too close to the bone." Dkt. 28 at 23-24.

Mr. Griffin asserts that Wexford has a policy of denying and delaying medical treatment to lower costs and this policy was the cause of his inadequate medical treatment. He similarly alleges that the IDOC continues to contract with Wexford "despite knowing that the mental and medical health care contractors knowingly engage in practices that are dangerous and threaten the safety, health, and wellbeing of prisoners." Dkt. 28 at 24-25.

Mr. Griffin also alleges that on February 18, 2019, during a chronic care visit with Dr. Talbot and while complaining about the lack of medical treatment for his injury from the incident with Mr. Eslick, Dr. Talbot raised false allegations that Mr. Griffin had been smoking. Dr. Talbot then threatened to shake-down Mr. Griffin and his cell. He contends the threatened shake down was in retaliation for his complaints about the medical care he received.

Mr. Griffin identifies two other alleged retaliatory events that occurred after he initiated this action: (1) on March 6, 2019, someone woke him up by banging on his cell wall and then

yelled that he should stop filing lawsuits; and (2) he was one of two inmates subjected to a shake down and strip search in April 2019.  He seeks to hold liable Warden Zatecky, Deputy Warden Reagle, Deputy Warden Alsip, Captain Ruttan, Captain Gilley, Captain Rinehart, Captain Boldman, Major Conyers, Lietenant Hill, Lieutenant McCutcheon, Lieutenant Shaver, and Lieutenant Simone on the theory that they "failed in properly training the staff members who engaged in these retaliatory actions." Dkt. 28 at 34.

Finally, Mr. Griffin contends that the conditions of his confinement violate his constitutional rights. He alleges that, as a result of improper psychiatric treatment for other inmates, he must live in an "unsafe, unsanitary, disfunctional [sic], and inhumane environment." Dkt. 28 at 34-40. He identifies twenty-six defendants for this claim: IDOC Commissioner Carter, Regional Director Osburn, the IDOC Executive Director of Classification, the IDOC Deputy Commissioner of Operations, Warden Zatecky, Deputy Warden Reagle, Deputy Warden Alsip, Unit Team Manager Safford, Case Work Manager Evans, Major Conyers, Captain Ruttan, Captain, Gilley, Captain Boldman, Captain Rinehart, Lieutenant Shaver, Lieutenant McCutcheon, Lieutenant Hill, Lieutenant Simone, Lieutenant Ernest, Sergeant Holmes, Correctional Officer Fish, Correctional Officer Hargus, Dr. Perry, Dr. Easter-Rose, Mental Health Specialist Perdue, and Wexford.

### C.    Analysis

Applying the screening standard to Mr. Griffin's complaint, some claims are dismissed while other claims shall proceed.

### 1.   Failure to Protect

Jail officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To state a claim for failure to protect, an inmate must assert:

5

"(1) that he was 'incarcerated under conditions posing a substantial risk of serious harm' and (2) that the defendants acted with 'deliberate indifference' to his health or safety." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834). Damages for "a deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence," *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000), or fear of an unrealized attack, *see Babcock v. White*, 102 F.3d 267, 270 (7th Cir. 1996). Rather, to sufficiently plead a claim for failure to protect, an inmate must "allege facts sufficient to show 'that the defendants had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" *Santiago*, 599 F.3d at 756 (quoting *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997)).

Here, Mr. Griffin has alleged that several individuals had knowledge of the threat posed by Mr. Eslick merely because they received conduct reports, incident reports, and classification papers pertaining to Mr. Eslick. These allegations are insufficient to show that these individuals had actual knowledge of an easily preventable impending harm against Mr. Griffin. The Eighth Amendment failure to protect claims against defendants Case Work Manager Evans, Unit Team Manager Safford, Deputy Warden Reagle, Deputy Warden Alsip, Warden Zatecky, Regional Director Michael Osburn, IDOC Commissioner Robert Carter, the IDOC Executive Director of Classification, the IDOC Deputy Commissioner of Operations, Captain Ruttan, Captain Gilley, Captain Boldman, Captain Rinehart, Lieutenant Shaver, Lieutenant McCutcheon, Lieutenant Hill, Lieutenant Simone, and Major Conyers[2] **are dismissed** for failure to state a claim upon which relief may be granted.

---

[2] Although Mr. Griffin identified Major Conyers as a defendant in his legal claims section, *see* dkt. 28 at 41, he does not allege that Major Conyers received any of the documents allegedly sent to

Mr. Griffin's Eighth Amendment failure to protect claims **shall proceed** against defendants Lieutenant Ernest, Mental Health Specialist Perdue, Dr. Easter-Rose, Sergeant Holmes, Officer Fish, and Officer Hargus.

### 2.   **Deliberate Indifference**

Mr. Griffin also contends the medical care he received after being stabbed by Mr. Eslick was insufficient. In order for an inmate to state a claim under § 1983 for medical mistreatment or the denial of medical care, the inmate must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn and that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Mr. Griffin's Eighth Amendment deliberate indifference claims relating to his medical treatment **shall proceed** against Lieutenant McCutcheon, Sergeant Sarten, Dr. Talbot, Nurse Moore-Groves, Nurse Walker, and Nurse Stephens.

### 3.   *Monell* **Claims**

Because Wexford acts under color of state law by contracting to perform a government function, it is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). To state a cognizable deliberate indifference claim against Wexford, Mr. Griffin must allege that he suffered a constitutional deprivation as the result of an express policy or custom of Wexford, or as a result of action by an official with policy-

---

the other defendants or that he otherwise had any knowledge of a potential threat to Mr. Griffin, *see* dkt. 28 at 9-17.

making authority. *See Glisson v. Ind. Dept. of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).  Mr. Griffin alleges that Wexford has a policy of denying and delaying medical treatment so as to lower the cost of medical care, so his allegations are sufficient to plausibly assert a Monell claim against Wexford. Mr. Griffin's Eighth Amendment policy claim against Wexford Health **shall proceed**.

Mr. Griffin attempts to also assert a claim against IDOC Commissioner Carter and Warden Zatecky on the basis that they continue to contract with Wexford Health to provide health services despite allegedly knowing that Wexford Health provides constitutionally deficient medical care. Dkt. 28 at 25-27. The first inquiry in every § 1983 case is whether there has been the deprivation of a right secured by the Constitution or laws of the United States, for without a predicate constitutional violation one cannot make out a *prima facie* case under § 1983. *Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992). Section 1983 is not itself a source of substantive rights; instead, it is a means for vindicating federal rights elsewhere conferred." *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997). This claim falters at this point, even when liberally construed. The IDOC's decision to delegate the provision of medical services to Wexford Health does not implicate any of Mr. Griffin's constitutional rights. If he believes Wexford Health has a policy of providing constitutionally inadequate care, or that any employees of Wexford Health are providing constitutionally inadequate care, he can do what he has done in this case—assert a claim against Wexford Health or the individual employees. His attempt to include IDOC Commissioner and Warden Zatecky in such a claim—solely on the basis that they are responsible for the contract with Wexford Health—is unavailing. These claims are **dismissed** for failure to state a claim upon which relief can be granted.

#### 4.   Retaliation and Conditions of Confinement Claims

"When screening prisoners' complaints under the [Prisoner Litigation Reform Act ("PLRA")], courts can and should sever an action into separate lawsuits or dismiss defendants who are improperly joined under Federal Rule of Civil Procedure 20(a)(2)." *Mitchell v. Kallas*, 895 F.3d 492, 502 (7th Cir. 2018) (quoting *Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011)). The Seventh Circuit has warned district courts to "beware of 'scattershot' pleading strategies" and "target for dismissal 'omnibus' complaints . . . that raise claims about unrelated conduct against unrelated defendants." *Id.* at 503. This warning arose "[o]ut of concern about unwieldy litigation and attempts to circumvent the PLRA's fee requirements." *Id.*; *see also Owens v. Evans*, 878 F.3d 559, 561 (7th Cir. 2017). "A prisoner may join defendants in the same action only if the claims against each one 'aris[e] out of the same transaction, occurrence, or series of transactions or occurrences." *Mitchell*, 895 F.3d at 502-03 (citing Fed. R. Civ. P. 20(a)(2)(A) and *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)).

Mr. Griffin filed his original complaint in this action on March 1, 2019. Dkt. 1. That complaint presented failure to protect and deliberate indifference claims under the Eighth Amendment related to the attack on Mr. Griffin by Mr. Eslick. *See id.* After multiple amendments identifying several additional defendants, *see* dkts. 6, 10, 19, 26, Mr. Griffin now seeks to assert claims alleging retaliation and unconstitutional conditions of confinement. Two of the three allegations of retaliation occurred after Mr. Griffin filed his original complaint. The conditions of confinement claims relate to the adequacy of psychological services available at Pendleton Correctional Facility. These claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences underlying Mr. Griffin's failure to protect and deliberate indifference claims.

Instead of *sua sponte* severing the retaliation and conditions of confinement claims into two new civil actions, Mr. Griffin shall have the opportunity to determine whether to pursue these claims as new actions or have them dismissed without prejudice. *Myles v. United States*, 416 F.3d 551, 552 (7th Cir. 2005) (noting that the composition and content of the complaint are entirely the responsibility of the plaintiff, for "even *pro se* litigants are masters of their own complaints and may choose who to sue-or not to sue"). If new actions are opened, Mr. Griffin will be responsible for a filing fee for each new case and the screening requirement of 28 U.S.C. § 1915A(b) will be triggered for each new case.

Mr. Griffin shall have **through August 9, 2019,** in which to **notify the Court** whether he wishes the Court to sever any claim into a new action, and if so, he shall identify which claims against which defendants. If Mr. Griffin fails to notify the Court, the misjoined claims will be considered abandoned and will be dismissed without prejudice.

### III.    Issuance and Service of Process

The clerk **is directed**, pursuant to Fed. R. Civ. P. 4(c), to issue process to defendants (1) Lieutenant Jason Ernest; (2) Mental Health Specialist Martin Perdue; (3) Dr. Ciemone Easter-Rose; (4) Sergeant Jerry Holmes; (5) Officer Fish; (6) Officer Hargus; (7) Nurse Brittany Moore-Groves; (8) Dr. Paul Talbot; (9) Nurse M. Walker; (10) Nurse Carrie Stephens; (11) Lieutenant Joseph McCutcheon; (12) Sergeant Sarten; and (13) Wexford Health. Process shall consist of the fifth amended complaint filed May 31, 2019 (dkt. 28), applicable forms (Notice of Lawsuit and Request for Waiver of Service of Summons and Waiver of Service of Summons), and this Entry.

### IV.    Summary

Mr. Griffin's Eighth Amendment failure to protect claims **shall proceed** against defendants Lieutenant Ernest, Mental Health Specialist Perdue, Dr. Easter-Rose, Sergeant Holmes, Officer

Fish, and Officer Hargus. His Eighth Amendment deliberate indifference claims relating to his medical treatment after being attacked **shall proceed** against Lieutenant McCutcheon, Sergeant Sarten, Dr. Talbot, Nurse Moore-Groves, Nurse Walker, and Nurse Stephens. His Eighth Amendment policy claim against Wexford Health **shall proceed**.

The **clerk is directed** to terminate from the docket all defendants except Lieutenant Jason Ernest, Mental Health Specialist Martin Perdue, Dr. Ciemone Easter-Rose, Sergeant Jerry Holmes, Nurse Brittany Moore-Groves, Dr. Paul Talbot, and Nurse Carrie Stephens.

The **clerk is directed** to add to the docket as defendants Officer Fish, Officer Hargus, Nurse M. Walker, Lieutenant Joseph McCutcheon, Sergeant Sarten, and Wexford Health.

**SO ORDERED.**

Date: 7/10/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

VIRGIL GRIFFIN
998996
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

MENTAL HEALTH SPECIALIST MARTIN PERDUE
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

DR. CIEMONE EASTER-ROSE
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

11

DR. PAUL TALBOT
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

NURSE BRITTANY MOORE-GROVES
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

NURSE M. WALKER
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

NURSE CARRIE STEPHENS
Medical Staff
PENDLETON CORRECTIONAL FACILITY
4490 W. Reformatory Road
Pendleton, IN 46064-9001

WEXFORD HEALTH
Corporation Service Company
135 N. Pennsylvania Street, Suite 1610
Indianapolis, IN 46204

Electronic Service to the following IDOC employees:
Lieutenant Jason Ernest
Sergeant Jerry Holmes
Officer Fish
Officer Hargus
Lieutenant Joseph McCutcheon
Sergeant Sarten
(All at Pendleton Correctional Facility)


Courtesy Copy to:

Doug Bitner
Katz, Korin, Cunningham PC
334 N. Senate Avenue
Indianapolis, IN 46204-1708

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VIRGIL GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-00882-JPH-MPB |
| | ) | |
| C. EASTER-ROSE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part Motion to Reconsider Dismissal of Claims
and Granting Motion to Dismiss Defendant Hargus**

**I.**

On July 30, 2019, the plaintiff filed a motion for relief from dismissal of claims asking the

Court to reconsider its dismissal of his failure to protect claims against Case Work Manager Evans,

Unit Team Manager Safford, Deputy Warden Reagle, Deputy Warden Alsip, Warden Zatecky,

Regional Director Michael Osburn, Indiana Department of Correction Commissioner of

Operations, Captain Ruttan, Captain Gilley, Captain Boldman, Captain Rinehart, Lieutenant

Shaver, Lieutenant McCutcheon, Lieutenant Hill, Lieutenant Simone, and Major Conyers and his

*Monell* policy claims against IDOC Commissioner Carter and Warden Zatecky. Dkt. 35. The

plaintiff's motion, dkt. [35], is **granted** to the extent the Court finds the allegations in the fifth

amended complaint and motion for relief are sufficient to state a failure to protect claim against

Case Work Manager Evans. The plaintiff's motion is **denied** as to all the other purported

defendants and claims for the reasons set forth in the Court's Entry dated July 10, 2019.

The **clerk is directed** to add Case Work Manager C. Evans as a defendant on the docket.

The **clerk is further directed**, pursuant to Federal Rule of Civil Procedure 4(c), to issue

process to defendant Case Work Manager C. Evans. Process shall consist of the fifth amended

1

complaint filed May 31, 2019 (dkt. 28), applicable forms (Notice of Lawsuit and Request for Waiver of Service of Summons and Waiver of Service of Summons), the Entry of July 10, 2019 (dkt. 30), and this Order.

## II.

The plaintiff's motion to dismiss defendant Officer Hargus, dkt. [54], is **granted**.

The **clerk is directed** to terminate defendant Officer Hargus as a defendant on the docket. No partial final judgment shall issue at this time.

**SO ORDERED.**

Date: 8/20/2019

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

VIRGIL GRIFFIN
998996
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

Lyubov Gore
INDIANA ATTORNEY GENERAL
lyubov.gore@atg.in.gov

Daniel F. Rothenberg
INDIANA ATTORNEY GENERAL

Electronic Service to the following IDOC employee at Pendleton Correctional Facility:
      Case Work Manager C. Evans

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VIRGIL GRIFFIN,                              )
                                             )
                    Plaintiff,               )
                                             )
            v.                               )        No. 1:19-cv-00882-JPH-MPB
                                             )
C. EASTER-ROSE, et al.                       )
                                             )
                    Defendants.              )


**NOTICE OF LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS**

**TO:   1) Case Work Manager C. Evans**

  **Why are you getting this?**

   A lawsuit has been filed against you, or the entity you represent, in the United States District Court for the Southern District of Indiana under the number shown above.  A copy of the complaint is attached.

   This is not a summons. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver.  To avoid these expenses, you must return the signed waiver within 30 days from the date shown below, which is the date this notice was sent.  Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy.  You may keep the other copy.

  **What happens next?**

   If you return the signed waiver, it will be filed with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you

and you will have 60 days from the date this notice is sent (see the date below) to answer the

complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

     If you do not return the signed waiver within the time indicated, the court will direct that

appropriate steps be taken to effect formal service in a manner authorized by the Federal Rules of

Civil Procedure and may require you, or the entity you represent, to pay the expenses of making

service.

     Please read the enclosed statement about the duty to avoid unnecessary expenses.

     I affirm that this request is being sent to you on behalf of the plaintiff this

  20th   day of      August     , 2019.

*CLERK OF COURT, Laura A. Briggs*

BY:                 

*Deputy Clerk*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VIRGIL GRIFFIN,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        No. 1:19-cv-00882-JPH-MPB
                                         )
C. EASTER-ROSE, et al.                   )
                                         )
                    Defendants.          )

**WAIVER OF THE SERVICE OF SUMMONS**

**TO:    Clerk of Court, Southern District of Indiana**

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.  I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:_____

_____
Signature of the Attorney or Unrepresented Party

_____
Printed or Typed Name

_____
Address

_____
E-mail address

_____
Telephone number

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does not include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.