UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VIRGIL GRIFFIN,                        )
                                       )
                    Plaintiff,         )
                                       )
             v.                        )        No. 1:19-cv-00882-JPH-MPB
                                       )
C. EVANS, et al.                       )
                                       )
                    Defendants.        )

## Order Granting in Part and Denying in Part
## Defendants' Motions for Summary Judgment

Virgil Griffin, an inmate currently incarcerated at Pendleton Correctional Facility ("PCF"), brought this civil rights action under 42 U.S.C. § 1983 alleging that several individuals at PCF violated his constitutional rights. Specifically, Mr. Griffin alleges that the defendants failed to protect him from an assault by another inmate, were deliberately indifferent to his serious medical needs following the assault, retaliated against him and were negligent. Defendants claim they are entitled to summary judgment on all claims.

### I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted undisputed (or disputed) fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse

party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II. Statement of Facts

The following statement of facts has been evaluated pursuant to the standard set forth above. The facts are considered undisputed except to the extent that disputes of fact are noted.

### A.   Defendants

Some of the individual defendants are prison staff while others are medical staff.

#### 1. PCF Staff

Mr. Griffin asserts claims against the following staff members at PCF: Chad Evans, Joseph McCutcheon, Jason Ernest, Jerry Holmes, and Matthew Sarten. *See* dkt. 119. Mr. Griffin identifies Mr. Evans as a case work manager at PCF who is responsible for administration of the rehabilitation plans and classification-related matters. *See* dkt. 207-1 at 6. Mr. McCutcheon is identified as a lieutenant at PCF. Dkt. 198-6 at ¶ 2. Mr. Ernest is identified as a lieutenant at PCF who was responsible for the unit in which Mr. Griffin was incarcerated. *Id.*; Griffin Dep. 76:23-77:5. Mr. Holmes and Mr. Sarten are both identified as sergeants at PCF. Dkt. 207-1 at 6; dkt. 198-5 at ¶ 2.

#### 2. Medical Staff

The following defendants are members of the medical staff at PCF: Dr. Paul Talbot, Carrie Stephens, Brittany Moore-Groves, Meaka Walker, Dr. Ciemone Easter-Rose, and Martin Perdue. *See* dkt. 207-1 at 7-8. Dr. Talbot is a physician licensed to practice medicine in the state of Indiana, and he worked at PCF as a physician during the times relevant to Mr. Griffin's complaint. Dkt. 196-6 at ¶¶ 1-2. Ms. Stephens is a registered nurse licensed to practice in the state of Indiana. Dkt. 196-5 at ¶ 1. At the time of the incidents underlying Mr. Griffin's claims, she worked as the Director of Nursing at PCF. *Id.* at ¶ 2. In that role, she "supervised the provision of nursing services [at PCF], assisted the Health

Services Administrator as needed, responded to informal grievances and requests submitted by patients to the health care unit, and addressed other issues that patients may present at the health care unit." *Id.* at ¶ 3.

Brittany Moore-Groves worked as a registered nurse at PCF at all times relevant to Mr. Griffin's claims. Dkt. 196-8 at ¶¶ 1-2. Meaka Walker worked as a licensed practical nurse at PCF during the incidents underlying Mr. Griffin's claims. Dkt. 198-7 at ¶¶ 1-2. In her role, Ms. Walker "administered medications and interventions for offenders in accordance with physician instructions." *Id.* at ¶ 2. Although her responsibilities varied, she often was responsible for distributing medication to inmates at PCF. *Id.* at ¶ 3.

Dr. Easter-Rose and Mr. Perdue were members of the mental health staff at PCF. *See* dkt. 196-3 at ¶ 2; dkt. 196-4 at ¶ 2. Dr. Easter-Rose worked as a psychologist at PCF at all times relevant to Mr. Griffin's complaint. Dkt. 196-3 at ¶¶ 1-2. Dr. Easter-Rose was part of the "multidisciplinary team directing and supervising clinical programs" at PCF, but she did not have the authority to move inmates to different units within PCF. *Id.* at ¶¶ 3, 9. During the incidents underlying Mr. Griffin's claims, Mr. Perdue worked as a mental health professional at PCF. Dkt. 196-4 at ¶¶ 1--2. Mr. Perdue was part of a multidisciplinary team that provided clinical services to inmates at PCF. *Id.* Like Dr. Easter-Rose, he did not have the authority to move inmates to different units within PCF. *Id.* at ¶ 16.

4

### B.    Mr. Griffin and Mr. Eslick

Inmates incarcerated at PCF can be placed in a restrictive housing unit ("RHU") based on the threat their presence in general population poses to themselves and others, the threat posed by the inmate on the security of the facility, and the need to regulate the inmate's behavior. Dkt. 196-9 (hereinafter "Griffin Dep.") at 29:22-30[1]; *see also* dkt. 196-2 at 1. At the beginning of 2019, both Mr. Griffin and Ryan Eslick, who later assaulted Mr. Griffin, were housed in the RHU at PCF. *Id.* at 7:13-19; 30:5-8.

In February 2019, Mr. Eslick was housed in a more restrictive cell than other inmates in the RHU. Mr. Eslick's cell had plexiglass covering the bars. *Id.* at 92:4-20. He was housed in this type of cell because he had a history of assaulting PCF staff and inmates. *See* dkt 207-1[2] at 32 (conduct report from April 2016 stating that Mr. Eslick wielded an 8-inch piece of metal through the cuff port on his cell door); *id.* at 35 (conduct report from September 2018 detailing Mr. Eslick's threats including a threat against Case Manager Evans); *id.* at 38 (incident report from October 2018 stating that Mr. Eslick used a shampoo bottle to squirt a mixture of urine and feces on a correctional officer); *id.* at 46 (conduct report dated November 21, 2018, concerning Mr. Eslick spraying another offender with an "unknown liquid substance" while in the

---

[1] The evidence designated by the parties includes two complete copies of the transcript from Mr. Griffin's deposition. *See* dkt. 196-9 *and* dkt. 198-1. For clarity and ease of reference, the Court will cite to the copy submitted by defendants Easter-Rose, Moore-Graves, Perdue, Stephens, Talbot, Walker, and Wexford of Indiana, LLC.

[2] Mr. Griffin submitted the same declaration in support of his opposition to both motions for summary judgment. *See* dkt. 207 *and* dkt. 210. The Court will cite to the first set of documents submitted by Mr. Griffin for clarity and ease.

shower); *id.* at 36 (incident report from January 2019 describing incident where Mr. Eslick spit on his suicide companion and threatened to spit on a correctional officer).

### C.     Mr. Eslick Attacks Mr. Griffin

Inmates in the RHU shower separately in individual shower stalls with solid locked doors. Griffin Dep. 36:1-37:6. The shower stalls have a cuff port used to place handcuffs on an inmate. *Id.* at 37:13-20.  On February 11, 2019, at approximately 9:30 p.m., Sergeant Holmes was escorting Mr. Griffin back to his cell after a shower. Dkt. 207-1 at 52-53; *see also* dkt. 198-2. When they passed by the shower cell occupied by Mr. Eslick, Mr. Eslick thrust an object out of the open cuff port and jabbed Mr. Griffin in the side. Dkt. 207-1 at 52. Sergeant Holmes took Mr. Griffin for medical evaluation by a nurse. *Id.*

According to Mr. Griffin, Nurse Moore-Groves examined his injuries and stated that she could not provide any medical treatment without orders from a doctor. Dkt. 207 at 2. Although Nurse Moore-Groves does not recall having direct contact with Mr. Griffin, she agrees that, as a nurse, she does not have "authority to order specific treatment plans or provide prescription medication to offenders without first consulting with a supervising physician and receiving orders." Dkt. 196-8 at ¶¶ 5, 7.

Mr. Griffin did not tell anyone about a specific threat made to him by Mr. Eslick before the attack. Dkt. 196-9 at 31:5-11. He argues that he was not obligated to have done so because Mr. Eslick "made no secret about who he was

or what he was [going to] do to anybody whether incarcerated or custody staff or anybody else." *Id.* at 31:1-16.

Mr. Griffin submitted a Request for Interview to Case Manager Evans and inquired whether Mr. Eslick was to be showered alone because he had previously assaulted another inmate during showers.[3] Dkt. 207-1 at 59. On February 19, 2019, Mr. Evans responded that Mr. Eslick would be "showering on his own line." *Id.*

### D.    Medical Care After February 11, 2019, Incident

Dr. Talbot examined Mr. Griffin shortly before noon on February 12, 2019, after a referral from PCF staff. Dkt. 196-1 at 42-45. He noted that Mr. Griffin had "2 small areas 3 mm diameter about 1 inch apart in lower left abdominal quadrant" and that there was "no visible sign of deep penetration beyond superficial abdomi[]nal wall." *Id.* at 43. Dr. Talbot ordered a test of Mr. Griffin's stool and a Hepatitis C and HIV screen for Mr. Griffin. *Id.* at 42. He also prescribed an antibiotic and directed a check of the "tetanus protocol" to see if a tetanus shot was "indicated." *Id.* In the order for the tetanus shot, Dr. Talbot directed that it be completed "ASAP." *Id.* at 45. The medical record also reflects that Dr. Talbot ordered a Hepatitis C and HIV screen for Mr. Eslick. *Id.*

Mr. Griffin was not taken to the medical unit for the treatment ordered by Dr. Talbot. Dkt. 207-1 at 2; Griffin Dep. 81:24-85:10. Mr. Griffin contends that Lt. McCutcheon knew that Dr. Talbot had ordered a tetanus shot but failed to

---

[3] Although this Request for Interview is dated January 12, 2019, Mr. Griffin references the February 11, 2019, incident where he was jabbed by Mr. Eslick during showers, dkt. 207-1 at 59, so this document had to have been made after the attack.

ensure that Mr. Griffin got a shot, and that Sargent Sarten delayed his medical treatment.  Dkt. 198-1 at 23..  Dkt. 198-1 at 22.

Both Lieutenant McCutcheon and Sergeant Sarten claim that they did not intend to interfere with Mr. Griffin's medical care, and they deny that their actions or inactions interfered with Mr. Griffin's medical care. Dkt. 198-5 at ¶ 8; dkt. 198-6 at ¶ 8.

A few days later, on February 15, 2019, Mr. Griffin submitted a Request for Health Care ("RFHC") complaining that he had not received the medical treatment ordered by Dr. Talbot. Dkt. 196-1 at 48. He reported that he had since broken out in rashes, developed headaches and nausea, and vomited. *Id.* He also stated that his injury had become infected. *Id.*

Nurse Moore-Groves examined Mr. Griffin during the early morning hours of February 17, 2019, in response to his RFHC. Dkt. 196-1 at 39-42. She observed "reddened scab-like lesions" on Mr. Griffin's inner and outer thighs and next to his injury. *Id.* at 41. Mr. Griffin informed Nurse Moore-Groves that those areas were "very itchy." *Id.*

During this examination, Nurse Moore-Groves verified that Mr. Griffin last received a tetanus shot on March 3, 2009, and she administered a tetanus shot. *Id.* at 40-41. Mr. Griffin alleges that, prior to administering the tetanus shot, Nurse Moore-Groves stated that the shot would hurt and that it would not be effective because it was being administered too late. Griffin Dep. 22:22-23:1. Mr. Griffin experienced pain throughout his arm and the left side of his body after

receiving the tetanus shot. Dkt. 207 at 3. He later developed nausea, dizziness, and vomiting. *Id.*

Although Nurse Moore-Groves states that she administered the shot "based on Dr. Talbot's order," dkt 196-8 at ¶ 9, she does not explain the reason for the delay between Dr. Talbot's order and administration of the tetanus shot. Mr. Griffin has submitted documentation from his grievance related to not receiving the tetanus shot, and Director of Nursing Carrie Stephens's response to the grievance explained that the tetanus shot was not given to Mr. Griffin until February 17, 2019, because that "was the first that nursing was made aware that this individual needed a [tetanus] shot." Dkt. 207-1 at 68. Mr. Griffin alleges that Nurse Moore-Groves stated that Nurse Walker was the individual who instructed Nurse Moore-Groves to administer the shot. Griffin Dep. 23:20-24. It is not clear how Nurse Walker became aware that a tetanus shot had been ordered.

On February 19, 2019, Mr. Griffin met with Dr. Talbot for a chronic care visit. Dkt. 196-1 at 35-38. Dr. Talbot noted that Mr. Griffin had dermatitis, fungus, skin bacteria, and an inflammatory reaction. *Id.* at 35. He gave Mr. Griffin several topical creams to treat these conditions. *Id.* Dr. Talbot also documented that Mr. Griffin "smelled strongly of smoke and admitted to smoking." *Id.* at 37. Mr. Griffin alleges that Dr. Talbot made accusations that Mr. Griffin had been smoking after he complained about the medical treatment he was receiving and about Ms. Stephens. Dkt. 207 at 4. Mr. Griffin further

states that Dr. Talbot "recruited" a correctional officer to shake down Mr. Griffin's cell. *Id.*

The next day, Mr. Griffin submitted a RFHC stating that he was experiencing a "painful sensation like nerve damage and a bone bruise." Dkt. 207-1 at 101. He requested medication to alleviate the pain. *Id.* Mr. Griffin met with a nurse on February 27, 2019, in response to this RFHC. *See* dkt. 207-1 at 101; dkt. 196-1 at 30-32. The nurse instructed Mr. Griffin to use a warm compress on the painful area and gave him Tylenol. *Id.* at 32. She also told him to fill out another RFHC if the symptoms worsened. *Id.*

A month later, on March 27, 2019, Mr. Griffin filed another RFHC complaining about the medical treatment he had received and stating that he had been dealing with "physical and mental agony" due to not receiving the screening for Hepatitis C ordered by Dr. Talbot. Dkt. 207-1 at 141. It appears that mental health staff responded to this RFHC, but the response is illegible. *Id.*

Mr. Griffin filed a third RFHC that was received on April 12, 2019. Dkt. 207-1 at 97. He stated that he was still experiencing tingling and numbness in his arm. *Id.* He asked for treatment to address these symptoms. *Id.* Mr. Griffin met with a nurse on April 17, 2019, in response to this RFHC. Dkt. 207-1 at 98-100; dkt. 196-1 at 15-16. The nurse referred Mr. Griffin for an appointment with Dr. Talbot. Dkt. 196-1 at 16.  Dr. Talbot met with Mr. Griffin on April 23, 2019, and ordered more Tylenol for Mr. Griffin's pain. Dkt. 196-1 at 12; *see also* dkt. 196-6 at ¶ 11.

Mr. Griffin filed two RFHCs in June 2019 seeking more pain medication for the pain in his arm. Dkt. 207-1 at 105, 107. He received the requested pain medication on both occasions. *Id.*

### E.   Designated Evidence Regarding the Tetanus Shot

Mr. Griffin's designated evidence includes information concerning the BOOSTRIX vaccine "for active booster immunization against tetanus, diphtheria, and pertussis" ("Tdap") and the Vaccine Information Statement for the tetanus vaccine[4] issued by the United States Department of Health and Human Services. *See* dkt. 207-1 at 109-138. The information for the BOOSTRIX vaccine indicates that the most common adverse reactions are pain, redness, and swelling at the site of the injection and headache, fatigue, and gastrointestinal symptoms. *Id.* at 117. It describes tetanus—one of the conditions which the vaccine is to protect against—as "a condition manifested primarily by neuromuscular dysfunction." *Id.* at 125. It does not, however, state how quickly a Tdap vaccine booster must be given after an incident or identify potential harmful effects of a delayed administration of a tetanus vaccine.

The Vaccine Information Statement describes tetanus as a condition that "causes painful stiffening of the muscles." *Id.* at 137. It also identifies pain, redness, or swelling at the site of the injection and fever, headache, fatigue, nausea, vomiting, diarrhea or stomachache as possible adverse effects of the tetanus vaccine. *Id.* at 138. The Vaccine Information Statement does not state

---

[4] The tetanus vaccine is often combined with the vaccine for diphtheria and pertussis. Because Mr. Griffin focuses solely on tetanus and refers to the treatment ordered by Dr. Talbot as a tetanus shot, *see, e.g.*, dkt. 206 at 2, the Court does the same.

how quickly after an incident the vaccine must be administered to be effective and minimize adverse effects or list potential harmful adverse effects of a delayed administration of the vaccine.

Dr. Talbot has presented evidence, by affidavit, that a tetanus vaccine "should be administered as soon as possible following a wound but should be given even to patients who present late for medical attention." Dkt. 196-6 at ¶ 7. He states that the incubation period for tetanus is "quite variable" and can be as short as three days, up to 21 days. *Id.* According to Dr. Talbot, "[m]ost cases occur within eight [] days." *Id.*

### III. Discussion

Mr. Griffin's claims are related to the incident on February 11, 2019, and the medical care he received thereafter.  He alleges that:

- Prison staff members[5] failed to protect him from being attacked by Mr. Eslick;

- Prison and medical staff[6] were deliberately indifferent to his serious medical needs after the attack;

- Wexford of Indiana, LLC ("Wexford") has an unconstitutional policy or practice of denying or delaying medical care to inmates to lower the cost of medical treatment;

---

[5] Mr. Evans, Lieutenant Ernest, Sergeant Holmes, Dr. Easter-Rose, and Mr. Perdue.
[6] Lieutenant McCutcheon, Sergeant Sarten, Dr. Talbot, Nurse Moore-Groves, Nurse Walker, and Ms. Stephens.

- A First Amendment retaliation claim that Dr. Talbot made accusations that Mr. Griffin was smoking and recruited a correctional officer to shake down Mr. Griffin's cell after he complained about his medical care; and

- All defendants were negligent.

### A.    Official Capacity Claims

An official capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690 n.55 (1978); *see also Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Therefore, a suit against an officer of a state agency in his official capacity is a suit against the state, and the state is not a "person" subject to suit under 42 U.S.C. § 1983. *Kolton v. Frerichs*, 869 F.3d 532, 535 (7th Cir. 2017); *Foreman v. Wadsworth*, 844 F.3d 620, 624 n.1 (7th Cir. 2016) ("A state official in his or her official capacity is not deemed a 'person' under § 1983."). Consequently, Mr. Griffin cannot assert a claim for monetary damages against the defendants in their official capacities.

Mr. Griffin can, however, assert a claim against the defendants in their official capacities for prospective injunctive relief under *Ex Parte Young*, 209 U.S. 123 (1908). In his sixth amended complaint, Mr. Griffin asks for a "permanent injunction ordering defendants to refrain from engaging in the acts and omissions described herein." Dkt. 207-1 at 30. Thus, Mr. Griffin's claims against the defendants in their official capacities can proceed insofar as Mr. Griffin seeks injunctive relief. Defendants Mr. Evans, Lieutenant Ernest, Sergeant Holmes, Lieutenant McCutcheon, and Sergeant Sarten therefore are not entitled to

13

summary judgment on Mr. Griffin's claims against them in their official capacities.

### B.    Failure to Protect

The Eighth Amendment proscription of cruel and unusual punishment "obligates prison officials to 'take reasonable measures to guarantee the safety of . . . inmates.'" *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  *See also  LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020).  An inmate "seeking to establish a violation of that Eighth Amendment right must show that the prison official was deliberately indifferent to an excessive risk to the [inmate's] health or safety, which includes both an objective and subjective component." *LaBrec*, 948 F.3d at 841. The first inquiry is whether the harm to which the inmate was exposed was "an objectively serious one." *Id.* The second inquiry is whether the prison official had "actual, not merely constructive, knowledge of the risk to be liable." *Id.* Specifically, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. "Because a prison official's duty under the

14

Eighth Amendment is to ensure 'reasonable safety,' prison officials who actually knew of a substantial risk to inmate health or safety can nevertheless escape liability if they responded reasonably to the risk, whether or not the harm was ultimately averted." *LaBrec*, 948 F.3d at 841 (quoting *Farmer*, 511 U.S. at 844-45).

### 1. Dr. Easter-Rose and Mr. Perdue

Mr. Griffin alleges that Dr. Easter-Rose and Mr. Perdue failed to protect him because they did not notify prison officials of the threat of attack presented by Mr. Eslick. Griffin Dep. 15:12-16:5, 17:3-13; *see also* dkt. 206 at 5-6. Dr. Easter-Rose and Mr. Perdue argue that they are entitled to summary judgment because (1) they were not aware of any threat to Mr. Griffin posed by Mr. Eslick and (2) they did not have any authority to move inmates to different units within PCF. *See* dkt. 195 at 22-25.

It is undisputed that prison officials knew that Mr. Eslick was dangerous and presented a risk to staff and inmates. Indeed, his track record of threatening and assaulting staff and other prisoners is why he was housed in a cell within the RHU with plexiglass covering the bars. Mr. Griffin does not explain, however, how additional reports to prison administrators from Dr. Easter-Rose or Mr. Perdue concerning Mr. Eslick's behavior would have prevented the attack. Moreover, there is no evidence that Dr. Easter-Rose or Mr. Perdue could have intervened to prevent Mr. Eslick's attack. The designated evidence shows that Dr. Easter-Rose and Mr. Perdue "did not have any authority to move [inmates] to a different unit within [PCF]." Dkt. 196-3 at ¶ 9 (Dr. Easter-Rose affidavit);

dkt. 196-4 at ¶ 16 (Mr. Perdue affidavit). Additionally, inmates in the RHU are escorted by a correctional officer—not mental health staff—whenever they are outside of their cells. Griffin Dep. 9:22-25.

Mr. Griffin has not designated evidence from which a jury could find Dr. Easter-Rose and Mr. Perdue liable under the Eighth Amendment for failure to protect Mr. Griffin so they are entitled to summary judgment as to those claims.

### 2.    Mr. Evans, Lieutenant Ernest, and Sergeant Holmes

Mr. Griffin contends that Mr. Evans and Lieutenant Ernest are liable for failure to protect him because they did not order Mr. Eslick to shower at a different time than everyone else or order that prison staff ensure that Mr. Eslick's cuff port was closed while he was in the shower. Griffin Dep. 74:3-13, 76:23-77:5. Mr. Griffin further contends that Sergeant Holmes knew that Mr. Eslick should be showered separately yet escorted Mr. Griffin in front of a shower cell occupied by Mr. Eslick. *Id.* 78:1-6.

"To contest summary judgment, [Mr. Griffin must] produce sufficient evidence for a rational jury to find that (1) [Mr. Eslick] presented an objectively serious risk of harm, and (2) a defendant was deliberately indifferent to that risk, meaning that he or she subjectively knew about the risk, and did not take reasonable measures to abate it." *Giles v. Tobeck*, 895 F.3d 510, 513 (7th Cir. 2018). Mr. Evans, Lieutenant Ernest, and Sergeant Holmes argue that Mr. Griffin cannot show that they each personally knew of a serious risk of harm to Mr. Griffin or that they each personally failed to take reasonable measures to abate

the known risk.[7] *See* dkt. 199 at 10-13. They further assert that they are entitled to qualified immunity. *Id.* at 15-17.

Mr. Evans, Lieutenant Ernest, and Sergeant Holmes contend that they are entitled to summary judgment because Mr. Griffin has not designated evidence showing that he informed each of them personally of a threat against him from Mr. Eslick. Dkt. 199 at 10-11. Mr. Griffin responds that he wasn't obligated to give each of them an individual notification of the threat that Mr. Eslick posed because Mr. Eslick "engaged in a routine pattern of assaults and threats", dkt. 209 at 8, and "made no secret about who he was or what he was [going to] do to anybody whether incarcerated or custody staff or anybody else," Griffin Dep. at 31:1-16.

"[I]n order to establish a constitutional violation, it does not matter 'whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.'" *Pierson v. Hartley*, 391 F.3d 898, 903 (7th Cir. 2004). Rather, "deliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant not known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim not known in advance of attack)." *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005). "Thus a deliberate indifference claim may be predicated on custodial

---

[7] Mr. Evans, Lieutenant Ernest, and Sergeant Holmes do not contest that Mr. Eslick posed an objectively serious risk of harm so the Court assumes for purposes of summary judgment that Mr. Eslick's propensity for attacking inmates and PCF staff, *see* dkt. 207-1 at 32-54 (various conduct and incident reports concerning Mr. Eslick), constituted an objectively serious risk of harm.

officers' knowledge that a specific individual poses a heightened risk of assault to even a large class of detainees—notwithstanding the officials' failure or inability to comprehend in advance the particular identity of this individual's ultimate victim." *Id.*

Mr. Griffin has designated evidence that Mr. Evans, Lieutenant Ernest, and Sergeant Holmes knew of the serious risk of harm posed by Mr. Eslick. Mr. Eslick was housed in a cell that had a layer of plexiglass covering the bars to prevent him from reaching out of his cell or throwing things onto the range "due to his history of assaulting staff and other offenders with bodily waste." Dkt. 199 at 3-4.  Moreover, conduct and incident reports detail numerous attacks by Mr. Eslick on PCF staff and other inmates. Dkt. 207-1 at 32-54. In the six months before he attacked Mr. Griffin, Mr. Eslick was cited for threatening a PCF staff member, spraying another offender with an unknown liquid substance while in the shower, and spitting on a suicide companion and threatening to spit on a PCF staff member. *See id.* And in April 2016, Mr. Eslick was disciplined for wielding an 8-inch piece of metal through the cuff port on his cell door. *Id.* at 32.

Mr. Evans, Lieutenant Ernest, and Sergeant Holmes have not designated evidence showing that they were unaware of the threat that Mr. Eslick presented to PCF staff and inmates, his prior conduct or why he was placed in a more restrictive cell covered with plexiglass. From the designated evidence, a jury could find that Mr. Evans, Lieutenant Ernest, and Sergeant Holmes knew that Mr. Eslick posed a heightened risk of assault to the individuals present in the RHU. *See Brown*, 398 F.3d at 915.

Mr. Evans, Lieutenant Ernest, and Sergeant Holmes next assert that even if they knew of the risk presented by Mr. Eslick, they are entitled to summary judgment because they responded reasonably to that risk. Dkt. 199 at 11-13. They rely on the fact that Mr. Eslick was housed in a cell covered with plexiglass for 23 hours a day and that he showered in a single shower stall with a solid, locked door. *Id.* Mr. Griffin contends that it was unreasonable for Mr. Eslick to shower at the same time as other inmates in the RHU and for the cuff port on his shower cell to be left open. Dkt. 209 at 8. He alleges that these facts "allowed the assault . . . to happen." *Id.*

"A prison official must respond reasonably to a known risk of harm, but negligence or even gross negligence is not enough to show a constitutional violation. Instead the official's response must be so inadequate that it amounts to a reckless disregard for the risk . . . and effectively condones the attack." *Giles*, 895 F.3d at 513 (internal quotation marks and citations omitted).

While the designated evidence shows that many appropriate steps were taken to mitigate the risk that Mr. Eslick presented to other prisoners, he was nonetheless able to attack Mr. Griffin because the cuff port to his shower stall was open. *See* dkt. 199 at 4. Mr. Evans, Lieutenant Ernest, and Sergeant Holmes do not designate evidence or present argument showing why Mr. Eslick's cuff port was open at the time he assaulted Mr. Griffin despite his known history of violence toward other inmates, including possessing and thrusting a sharp, metal weapon through his cuff port. *See* dkt. 199 at 12. Nor do they designate evidence or present argument showing why Mr. Eslick was allowed to shower at

19

the same time as other inmates despite his known of history of violence toward other inmates, including attacking other inmates in the shower area. *See* 207-1 at 46.

Considering the designated evidence, a jury could conclude that Mr. Evans, Lieutenant Ernest, and Sergeant Holmes recklessly disregarded the threat presented by Mr. Eslick. Therefore, these individuals are not entitled to summary judgment on the failure-to-protect claims.

Mr. Evans, Lieutenant Ernest, and Sergeant Holmes next contend that they are entitled to qualified immunity. Dkt. 199 at 15-17. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation and internal quotation marks omitted). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016). Because Mr. Griffin has presented evidence to support a finding that his constitutional rights were violated, the Court will focus on the second inquiry: whether the right at issue was clearly established.

When a prison official has subjective knowledge of a risk of serious harm, "it is clearly established that . . . the prison official [must] reasonably respond to abate that risk of harm to the victim." *Sinn*, 911 F.3d at 422. If it is reasonable

to infer that a prison official had such knowledge but did not take adequate responsive action, it is "well-settled, clearly established law that such a failure constitutes deliberate indifference" and the prison official is not entitled to qualified immunity. *Id.*

Here, a reasonable jury could find that Mr. Evans, Lieutenant Ernest, and Sergeant Holmes had knowledge of a risk of serious harm to Mr. Griffin yet did not take adequate action to abate that risk. While general protocols were in place to mitigate the harm that Mr. Eslick presented to other prisoners, he was nonetheless able to attack Mr. Griffin because he was permitted to be on the shower range at the same time as Mr. Griffin and his cuff port was open. Applying *Sinn*, these individuals are thus not entitled to qualified immunity because their failure to act violated well-settled, clearly established law. *See also Gevas v. Laughlin*, 798 F.3d 475, 484-85 (7th Cir. 2015) (rejecting qualified immunity defense where the record before the court, "construed in the light most favorable to the plaintiff," demonstrated that the plaintiff "was in danger of being harmed [], and yet did nothing to address that danger *other* than having previously made him aware that he had the option to refuse housing, be ticketed in response, and have himself transferred into disciplinary segregation"). Mr. Evans, Lieutenant Ernest, and Sergeant Holmes are therefore not entitled to summary judgment based on the doctrine of qualified immunity.

### C.   Medical Care

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d

403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] performs a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc).

For the objective part of the analysis, the plaintiff must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citing *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 810 (7th Cir. 2000)).

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 837). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728.

### 1.   Lieutenant McCutcheon and Sergeant Sarten

Mr. Griffin argues that Lieutenant McCutcheon and Sergeant Sarten exhibited deliberate indifference in violation of the Eighth Amendment because they knew that Mr. Griffin needed the treatment ordered by Dr. Talbot yet they

did not take him to get treated. *See* dkt. 209 at 13; dkt. 207-1 at 14-15; Griffin Dep. 81:24-82:3, 85:8-86:5. Lieutenant McCutcheon and Sergeant Sarten claim they are entitled to summary judgment because they relied on medical professionals concerning Mr. Griffin's medical care. *See* dkt. 199 at 8-10.

"[A] non-medical prison official will generally be justified in believing that the prisoner is in capable hands" when the prisoner is under the care of a medical professional. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. ), *cert. denied*, 140 S. Ct. 50 (2019), Here, Mr. Griffin claims that Lieutenant McCutcheon and Sergeant Sarten were deliberately indifferent to his serious medical needs because they ignored Dr. Talbot's directions and failed to do what Dr. Talbot ordered. *See id.* 81:24-82:3, 85:11-87:4.

Lieutenant McCutcheon and Sergeant Sarten do not dispute that Dr. Talbot ordered Mr. Griffin to receive the tetanus shot and additional testing or that they did not take Mr. Griffin to the medical unit for the treatment and tests. *See* dkt. 199 at 5. They have not designated evidence disputing Mr. Griffin's statements that they knew of Dr. Talbot's orders; that Sergeant Sarten knew that a tetanus shot should be administered within 24 hours; and that inmates in the RHU must be escorted by a correctional officer whenever they are outside of their cells. *See* Griffin Dep. 9:22-25, 38:21-39:2. Although Lieutenant McCutcheon and Sergeant Sarten claim that they did not intend to interfere with Mr. Griffin's medical treatment and that they did not interfere with his medical treatment, *see* dkt. 198-5 at ¶ 8; dkt. 198-6 at ¶ 8, these statements must be evaluated in the context of all the evidence. This necessarily involves making credibility

determinations, accepting some evidence while rejecting other evidence, and ultimately determining what happened. These are functions reserved for a jury, and a jury could conclude from the designated evidence that Lt. McCutcheon and Sgt. Sarten were deliberately indifferent to Mr. Griffin's serious medical needs. Lieutenant McCutcheon and Sergeant Sarten therefore are not entitled to summary judgment on these claims.[8]

### 2. Dr. Talbot, Ms. Stephens, Nurse Moore-Groves, and Nurse Walker

Mr. Griffin claims that medical staff were deliberately indifferent to his serious medical needs following the attack on February 11, 2019, when:

- Nurse Moore-Groves failed to provide medical care on the night of the incident;

- Dr. Talbot failed to ensure the treatment that he ordered was provided;

- Ms. Stephens failed to ensure that the treatment Dr. Talbot ordered was rendered;

- Nurse Walker directed that Mr. Griffin be given a tetanus shot when she knew it would be ineffective; and

- Nurse Moore-Groves administered the tetanus shot even though she knew it would be painful. *See* dkt. 207-1 at 12-17.

---

[8] In their reply, Lieutenant McCutcheon and Sergeant Sarten assert for the first time that Mr. Griffin cannot show that he suffered any harm from not being taken to receive the ordered medical treatment on February 12, 2019. *See* dkt. 212 at 6. Because Lieutenant McCutcheon and Sergeant Sarten did not raise this argument until their reply, it is waived. *See Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established [] that skeletal arguments may be properly treated as waived, as may arguments made for the first time in reply brief." (internal quotation marks and citations omitted)).

A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. One "type of evidence that can support an inference of deliberate indifferent is an inexplicable delay in treatment which serves no penological interest." *Id.* at 730. While "delays are common in the prison setting with limited resources, [] whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730-31.

Nurse Moore-Groves is entitled to summary judgment on Mr. Griffin's claim that she failed to provide medical treatment on the night of February 11, 2019. Mr. Griffin has not shown that he was harmed by the delay between when he met with Nurse Moore-Groves on the evening of February 11, 2019, and when he met with Dr. Talbot in the late morning on February 12, 2019. Without evidence of injury caused by the delay, a jury could not find for Mr. Griffin on an Eighth Amendment claim. *See Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020) ("To establish an entitlement to damages for [an Eighth Amendment violation], the prisoner must provide evidence that he presented an objectively serious medical need that a defendant [] responded to with deliberate indifference, thereby resulting in some injury.").

Mr. Griffin has designated evidence from which a jury could find that Ms. Stephens, Nurse Walker, and Nurse Moore-Groves were deliberately indifferent

25

with respect to the treatment ordered by Dr. Talbot. They do not dispute that Mr. Griffin did not receive the tetanus shot ordered by Dr. Talbot until almost five days after it was ordered, *see* dkt. 195 at 8-9, and they do not provide an explanation for the delay. Mr. Griffin has presented evidence that the delay was caused by nursing staff not being made aware of the order, *see* dkt. 207-1 at 68, and there is no explanation for that lapse in communication. Similarly, Mr. Griffin has designated evidence that he did not receive the Hepatitis C and HIV screening for at least six weeks after they were ordered. *See* dkt. 207-1 at 141.

Although Ms. Stephens contends that she does not recall having face-to-face contact with Mr. Griffin in February 2019, she admits that she had "the authority to take steps to ensure that Mr. Griffin received the appropriate nursing services . . . in order to ensure that he had access to medical care." Dkt. 195 at 25-26. Based on this evidence, a reasonable jury could conclude that it was Ms. Stephens's responsibility to make sure that Mr. Griffin received the medical treatment ordered by Dr. Talbot and that her failure to do so constitutes deliberate indifference.

Similarly, Nurse Walker argues that she is entitled to summary judgment because she does not recall interacting with Mr. Griffin in February 2019. *See* dkt. 195 at 29; dkt. 196-7 at ¶¶ 7-8. Mr. Griffin has submitted evidence that Nurse Walker directed Nurse Moore-Groves to give Mr. Griffin the tetanus shot, and that Nurse Walker knew the tetanus shot would be ineffective given the delay between the incident and its administration. Griffin Dep. 23:20-24:11. This

evidence is sufficient to establish a material factual dispute as to Nurse Walker's involvement in, and responsibility for, the delayed tetanus shot.

Mr. Griffin has also designated evidence to show that he was harmed by the alleged delay in providing the medical treatment ordered by Dr. Talbot. Mr. Griffin has presented evidence that he developed a rash and experienced headaches, vomiting, and nausea between the February 11, 2019, incident and administration of the tetanus shot. *See* dkt. 196-1 at 48. He also testified at his deposition that Nurse Moore-Groves told him he would experience pain as a result of the delayed administration of the tetanus shot, Griffin Dep. 22:22-23:1, and it is undisputed that he received treatment for pain following administration of the shot, dkt. 196-1 at 12, 15-16, 30-32; dkt. 207-1 at 97-101, 105, 107, 141.

Dr. Talbot is also entitled to summary judgment on Mr. Griffin's claims that he exhibited deliberate indifference by failing to ensure that the treatment he ordered was rendered. The record demonstrates that Dr. Talbot examined Mr. Griffin after the attack and ordered a series of tests to determine if Mr. Griffin required further treatment. Dkt. 196-1 at 42-45; *see also* dkt. 196-6 at ¶¶ 4-5. While Mr. Griffin alleges that Dr. Talbot had "an obligation to guarantee timely medical treatment once prescribed," he does not cite authority in support of this assertion. Dkt. 206 at 10. And regardless, he has not designated evidence showing that Dr. Talbot knew of a substantial risk that the prescribed treatment would not be provided and nonetheless chose to ignore that risk.

27

Nurse Moore-Groves is entitled to summary judgment on Mr. Griffin's Eighth Amendment claim related to the failure to provide treatment on the night of the incident.  Dr. Talbot is entitled to judgment as a matter of law on Mr. Griffin's claim that Dr. Talbot violated the Eighth Amendment by failing to ensure the medical treatment he prescribed was provided.  Ms. Stephens, Nurse Walker and Nurse Moore-Groves, however, are not entitled to summary judgment on Mr. Griffin's Eighth Amendment claims related to the delay in receiving the medical treatment ordered by Dr. Talbot on February 12, 2019.

### D. *Monell* Claim

Mr. Griffin contends that defendant Wexford Health ("Wexford"), has a policy, practice, or custom of denying, delaying, and interfering with the medical treatment of inmates at PCF for the "purpose of preserving the cost of treating" inmates. Dkt. 207-1 at 18-19. Wexford seeks summary judgment on this claim, arguing that Mr. Griffin cannot show that Wexford maintained an unconstitutional policy or practice. Dkt. 195 at 31-32.

Wexford is "treated the same as a municipality for liability purposes under § 1983." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). Thus, to hold a private corporation liable under § 1983, a plaintiff must establish that the alleged "constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). If a plaintiff provides "no evidence of an unconstitutional policy or custom of Wexford itself, [] precedents doom his claim against the corporation." *Id.*

28

Mr. Griffin has not designated evidence showing that Wexford has a practice of denying, delaying, or interfering with the medical care of inmates to save costs. Although "there is no clear consensus as to how frequently such conduct must occur to impose [] liability," the Seventh Circuit has established that "it must be more than one instance . . . or even three." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (internal quotation marks and citations omitted). A plaintiff "must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). Mr. Griffin's allegations of a practice based on his own two experiences and one experience of another inmate, *see* dkt. 206 at 15; dkt. 207-1 at 75, are insufficient to demonstrate a widespread practice rather than isolated incidents.

Additionally, Mr. Griffin asserts that Wexford maintains an unconstitutional policy because Nurse Moore-Groves told him that she could not administer medical care without a doctor's orders when she examined him on the night of February 11, 2019. Dkt 207-1 at 12; *see also* Griffin Dep. 35:14-18. In her affidavit, Nurse Moore-Groves avers that she does not "have authority to order specific treatment plans or provide prescription medication to offenders without first consulting with a supervising physician and receiving orders." Dkt. 196-8 at ¶ 5.

Mr. Griffin has not presented evidence to establish that the alleged policy of not allowing a nurse to provide treatment without a physician's orders is categorically unconstitutional. It is undisputed that Nurse Moore-Groves served

as a registered nurse at PCF on February 11, 2019, dkt. 196-8 at ¶¶ 1-2, and Article 23 of Title 25 of the Indiana Code outlines the responsibilities of registered nurses, *see* Ind. Code § 25-23-1-1.1, *et seq.* The definition of "registered nursing" includes "executing regimens delegated by a physician with an unlimited license to practice medicine . . . ." Ind. Code § 25-23-1-1.1(b)(5). Thus, there is no evidence that Wexford's policy runs afoul of what Indiana law requires. "[E]nforcement of a state law does not constitute an actionable official policy." *Vasquez v. Foxx*, 895 F.3d 515, 519 (7th Cir. 2018).

Wexford is entitled to summary judgment on this claim.

### E.   Retaliation

Mr. Griffin asserts a First Amendment retaliation claim against Dr. Talbot. He alleges that Dr. Talbot accused Mr. Griffin of smoking and "recruited" a correctional officer to shake down Mr. Griffin's cell after he complained about his medical treatment. *See* dkt. 207 at 4; dkt. 207-1 at 23-24. Dr. Talbot seeks summary judgment on this claim. Dkt. 195 at 32-33.

To prevail on a First Amendment retaliation claim, Mr. Griffin must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017).

Mr. Griffin has submitted sufficient evidence on summary judgment to show that he engaged in activity protected by the First Amendment. Specifically, he states that Dr. Talbot made accusations of smoking and ordered a shake

down of Mr. Griffin's cell after Mr. Griffin complained about his medical treatment. Dkt. 207 at 4; dkt. 207-1 at 23-24. Oral complaints about prison staff are protected under the First Amendment. *See Caffey v. Maue*, 679 F. App'x 48, 490 (7th Cir. 2017).

He has not, however, established that he suffered a deprivation that would likely deter First Amendment activity. "[T]he test for determining whether prison staff violated a prisoner's First Amendment right . . . is objective: would the response of prison staff to the prisoner's [protected activity] deter a prisoner of 'ordinary firmness' from seeking redress?" *Pannell v. Eads*, No. 20-1313, 2021 WL 3634921, *2 (7th Cir. Aug. 17, 2021) (quoting *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020)).

"Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, [the court] can resolve the issue as a matter of law." *Douglas*, 964 F3d at 647. Here, there is no evidence that the shake down of a cell would deter an inmate of ordinary firmness from engaging in activity protected by the First Amendment. The Supreme Court has recognized that prison officials may search prison cells at any time and "that prisoners have no legitimate expectation of privacy" in their cells. *See Hudson v. Palmer*, 468 U.S. 517, 529-530 (1984) ("[W]holly random searches are essential to the effective security of penal institutions."). Because prison officials can search an inmate's cell at any time, such searches are not likely to deter inmates from exercising their First Amendment rights. Dr. Talbot is entitled to judgment as a matter of law on Mr. Griffin's First Amendment retaliation claim.

### F.   Negligence

Mr. Griffin alleges that the defendants were negligent on February 11, 2019, and during the medical treatment he received afterwards. Dkt. 207-1 at 28-29. "A plaintiff seeking damages for negligence must establish (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Pfenning v. Lineman*, 947 N.E.2d 392, 398 (Ind. 2011).

"Ordinarily, summary judgment is inappropriate in negligence cases." *Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 783 (Ind. 2004). Although questions of law such as whether a defendant had a duty of care may be appropriate for summary judgment, "[i]ssues of negligence, contributory negligence, causation, and reasonable care are more appropriately left for the determination of a trier of fact." *Kader v. State of Indiana*, 1 N.E.3d 717, 726 (Ind. Ct. App. 2013) (quotation marks and citation omitted). Here, the issues disputed by the parties are those Indiana courts have recognized are inappropriate for summary judgment. *See* dkt. 195 at 33-36; dkt. 199 at 14-15.  Thus, the Court will leave those issues to be resolved by the trier of fact.[9]

However, the Court will not exercise supplemental jurisdiction over all of Mr. Griffin's state law negligence claims. The Seventh Circuit has made clear

---

[9] Defendants Lieutenant Ernest, Mr. Evans, Sergeant Holmes, Lieutenant McCutcheon, and Sergeant Sarten take issue with Mr. Griffin's failure to specifically address their arguments concerning the negligence claims in his response. *See* dkt. 212 at 7. Although Mr. Griffin did not specifically address his negligence claims in his response, the evidence he submitted in support of his Eighth Amendment claims is sufficient to support his negligence claims.

that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Electronics v. Met. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.").

As explained above, Dr. Easter-Rose, Mr. Perdue, Dr. Talbot, and Wexford are entitled to summary judgment on all federal claims asserted against them. The Court finds no reason to deviate from the usual practice that any supplemental claims against these defendants should be dismissed without prejudice. Thus, the Court exercises its discretion to relinquish supplemental jurisdiction over the state law negligence claims against Dr. Easter-Rose, Mr. Perdue, Dr. Talbot, and Wexford.

## IV. Conclusion

The motion for summary judgment filed by defendants Dr. Easter-Rose, Nurse Moore-Groves, Mr. Perdue, Ms. Stephens, Dr. Talbot, Nurse Walker, and Wexford, dkt. [194], is **granted in part and denied in part.** It is **granted** with respect to Mr. Griffin's failure to protect claims against Dr. Easter-Rose and Mr. Perdue, his policy claim against Wexford, his Eighth Amendment deliberate indifference claim against Dr. Talbot, his Eighth Amendment deliberate indifference claim related to Nurse Moore-Groves's alleged failure to provide medical care on the evening of February, 11, 2019, and his First Amendment retaliation claim against Dr. Talbot. These claims are **dismissed with prejudice**.

The summary judgment motion is **denied** as to Mr. Griffin's Eighth Amendment deliberate indifference claims against Ms. Stephens, Nurse Walker, and Nurse Moore-Groves related to the delay in receiving the medical treatment ordered by Dr. Talbot on February 12, 2019, and his negligence claims against Ms. Stephens, Nurse Walker, and Nurse Moore-Groves.

The motion for summary judgment filed by defendants Lieutenant Ernest, Mr. Evans, Sergeant Holmes, Lieutenant McCutcheon, and Sergeant Sarten, dkt. [198], is **denied**.

The Court exercises its discretion to relinquish supplemental jurisdiction over the state law negligence claims against Dr. Easter-Rose, Mr. Perdue, Dr. Talbot, and Wexford as all federal claims against those defendants have been resolved via the motions for summary judgment. Those claims are **dismissed without prejudice**.

The **clerk is directed** to update the docket to reflect the correct spelling of defendant Moore-Groves's name.

The **clerk is further directed** to terminate Dr. Easter-Rose, Mr. Perdue, Dr. Talbot, and Wexford as defendants on the docket.

**SO ORDERED.**

Date: 9/2/2021

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

VIRGIL GRIFFIN
998996
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Bryan Findley
INDIANA ATTORNEY GENERAL
bryan.findley@atg.in.gov

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

Sarah Jean Shores
INDIANA OFFICE OF THE ATTORNEY GENERAL
sarah.shores@atg.in.gov